**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| John Doe, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:19-cv-56 TLS-JPK |
| | ) | |
| Purdue University, et al., | ) | |
|     Defendants | ) | |

**Declaration of Cynthia Purcell Garrett In Support
Of Plaintiff's 1st Amended Complaint**

I, Cynthia Purcell Garret, declare pursuant to 28 U.S.C. §1746 that:

1. I am an attorney licensed by the State of California.

2. Since November 2016, I have been Co-President of Families Advocating for Campus Equality (FACE) a §501(c)(3) nonprofit; I have served on its Board of Directors since 2014. FACE provides support for students and families affected by inequitable Title IX processes. Between 1500 and 2000 students have relied on FACE for support.

3. Since November 2014, I have served on the board of Stop Abusive and Violent Environments a § 501(c)(3) nonprofit that provides support for students and families affected by inequitable Title IX processes.

4. In 2017, I served on the American Bar Association's Criminal Justice Section Task Force which developed the attached guidelines for university disciplinary proceedings related to allegations of sexual misconduct.

5. Since 2016, I have served as a Liaison on the American Law Institute's Student Sexual Misconduct project which is in the process of developing *Procedural Frameworks for Colleges and Universities and Sexual Assault and Related Offenses Projects.*

6. While engaging in the activities detailed in items 2-5, I have reviewed over a hundred court decisions addressing the emotional, educational and professional challenges facing students disciplined by universities. These decisions include, but are not limited to the following:

    i. *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018)(noting "[t]ime and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct . . . Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life . . . [such

as] difficulty obtaining educational and employment opportunities down the road, especially if he is expelled.");

ii. *Flaim v. Med Coll. of Ohio,* 418 F.3d 629, 638 (6th Cir. 2005) (discussing how disciplinary violation will "interfere with later opportunities for higher education and employment" is so clear as to almost be a truism.");

iii. *Marshall v Indiana Univ.* 170 F.Supp.3d 1201, 2016 (S.D. Ind. Mar. 15, 2015)(discussing the implication of disclosing a sexual misconduct disciplinary finding as being the "inability to reenroll at another university . . . [because any] subsequent university to which a student may apply always knows of the reasons for his prior dismissal. If he leaves without having earned his degree, the student must make an affirmative showing to any subsequent university to which he applies that he left the original university in good standing");

iv. *King v. DePauw Univ.*, 14-cv-70, 2014 WL 4197507 *13 (S.D. Ind. Aug. 22, 2014)( "[t]he Court finds it inevitable that [plaintiff] would be asked to explain [the discipline to] future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw. Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding.");

v. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573, 607 (D. Mass. 2016) (noting a sexual misconduct finding "may permanently scar [a student's] life and career," as he or she would be "marked for life as a sexual predator");

vi. *Furey v. Temple Univ.,* 884 F.Supp.2d 223, 247-48 (E.D.Pa.2012) ("[e]xpulsion denies the student the benefits of education at his chosen school. Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior. Expulsion is likely to affect the student's ability to enroll at other institutions of higher education and to pursue a career.");

vii. *Greenhill v. Bailey*, 519 F.2d 5, 8 (6th Cir. 1975) (acknowledging expulsion of medical student effectively destroyed his chance of practicing medicine);

viii. *Schaer v. Brandeis Univ.*, 716 N.E.2d 1055, 1059 (Mass. App. Ct. 1999) (discussing how student record of misconduct significantly harms student's future career)

7. While engaging in the activities detailed in items 2-6, I have had hundreds of conversations with students and/or their parents about the emotional, educational and professional challenges these students face in transferring to other universities and/or seeking professional licenses after being disciplined by universities for alleged sexual misconduct. The emotional repercussions of being wrongfully accused of a sexual offense, even when found not responsible, are debilitating. The vast majority of the accused students

with whom I've spoken have considered suicide in the wake of these wrongful accusations. Their despondency arises from their realization that, no matter how much they "do the right thing," their life can be ruined and their future eviscerated through no fault of their own.

8. Prior to executing this declaration, I reviewed Plaintiff John Doe's ("Doe") original complaint in this case and received information about Doe's intention of becoming an attorney and/or working in the financial services field.

9. Based on my experience, training, education, and knowledge gained from my activities in ¶¶ 2-8, I offer the opinions in ¶¶10-14 below with reasonable professional certainty.

10. Doe will face a legal obligation to disclose – often under penalty of perjury - Purdue's discipline of Doe to, at a minimum: (a) law schools; (b) graduate schools to which Doe might seek an MBA; and/or (c) state and/or federal entities that issue licenses to practice law and/or financial services.

11. It would be virtually impossible for Doe to obtain the educational and/or licensing credentials to practice law or work in the financial services profession without encountering a legal obligation to disclose Purdue's discipline to law schools, graduate schools, and/or licensing boards. This is because applications for most law schools, graduate schools, and licensing boards contain a legal obligation to disclose disciplinary actions such as Purdue's discipline of Doe.

12. After Doe complied with his legal obligation to disclose Purdue's discipline to the law schools, graduate schools, and/or licensing boards, Doe would almost certainly be required to sign a release authorizing Purdue to provide the law schools, graduate schools, and/or licensing boards with documents related to Purdue's discipline of Doe.

13. If Doe signed the release discussed in the preceding paragraph, it would be virtually impossible for Doe to enroll in a law school or graduate school comparable to Purdue. This is because American institutions of higher education with reputations for excellence routinely reject applications of students who disclose sexual misconduct disciplinary findings in applications for admissions.

14. If Doe failed to report Purdue's discipline on applications to law schools, graduate schools, and/or licensing boards – and Doe's failure was subsequently revealed - it is almost certain that the academic and licensing institutions would impose sanctions which could include, but not be limited to, expulsion from the academic institutions and/or licensed professions.

I declare under penalty of perjury under the laws of The United States of America that the foregoing is true and correct.

Dated: San Diego California
August 8, 2019

_Cynthia P Garrett_
Cynthia Purcell Garrett

June 2017

### ABA CRIMINAL JUSTICE SECTION TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTIONS:  RECOMMENDATIONS FOR COLLEGES AND UNIVERSITIES IN RESOLVING ALLEGATIONS OF CAMPUS SEXUAL MISCONDUCT

The Executive Committee of the ABA Criminal Justice Section commissioned the Task Force on College Due Process Rights and Victim Protections in November 2016. Immediately after, extensive efforts were made to find members that represented all interested parties: victims, the accused, universities, other stakeholders, and national experts. The Task Force was fully constituted in the winter of 2017, and it ended up including two voting members who were originally liaisons from the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice. This elevation was made in recognition of their significant contributions.

Although the Task Force worked expeditiously, it did so because members were eager to try to have a positive impact on this critical area of public policy. The Task Force believed it likely that the new administration would release new directives to replace the 2011 Dear Colleague Letter, issued by the U.S. Department of Education Office for Civil Rights. In the greatest of traditions of the ABA and the Criminal Justice Section, members wanted to contribute to the public discussion.

The Task Force drafted these *Recommendations* to provide guidelines to colleges and universities in resolving allegations of campus sexual misconduct. They are aspirational and reflect the Task Force's collective judgment for a fair process. These *Recommendations* do not represent the views of one person or even a group of people but the views of the collective whole for which there was complete consensus among all Task Force members. The recommendations were necessarily the product of extensive discussions and compromise. Various stakeholders agreed to bend on certain provisions in order to obtain other provisions of import to them and in order to reach unanimity. These *Recommendations* are not exhaustive. The Task Force recognizes that it did not discuss every relevant issue, but it aimed to address the more salient ones. Nor are the *Recommendations* intended to be mandated detailed scripts or to limit the discretion of schools to adopt different procedures. Instead they are intended to provide schools with useful guidelines. In addition, not all of these recommendations are consistent with the 2011 Dear Colleague Letter. On May 6, the ABA Criminal Justice Section Council voted unanimously to endorse these *Recommendations* for publication.[1]

Throughout these *Recommendations*, the Task Force uses the word "should" which recognizes the diversity among schools and the lack of authority in requiring schools to have certain provisions. Where the law requires a school to have a certain provision mandatory language is used.

---

[1] Although these *Recommendations* were unanimously endorsed for publication by the Criminal Justice Section Council, they have not been endorsed by any other section of the ABA, including the ABA Commission on Domestic and Sexual Violence and the ABA Section of Civil Rights and Social Justice.

Complainant refers to the alleged victim, although the Task Force acknowledges that sometimes they may not be the same person. Respondent refers to the alleged perpetrator. The Task Force also refers to complainant and respondent in the singular even though there may be more than one. The decision-maker refers to the person(s) who determine whether a violation occurred.

I.   SCHOOL'S RIGHT AND RESPONSIBILITY TO ADDRESS CAMPUS SEXUAL MISCONDUCT

Title IX prohibits sex discrimination in educational programs or activities that receive federal financial assistance. Sex discrimination includes sexual harassment and sexual misconduct. The Department of Education and federal courts have interpreted this federal law to require schools to respond to allegations of student sexual misconduct in a timely and effective manner.

A.   **Cooperation with, and Independence from, Law Enforcement**

The Task Force recognizes the school's responsibility to address sexual misconduct on its campus for protection of its community. Schools should be able to determine whether a violation of school policy has occurred regardless of whether there has been a violation of criminal law. Where police investigation has been initiated, schools should work cooperatively with law enforcement to the extent permissible by state and federal law.

B.   **Investigate Both Sides**

The school's investigator must conduct a prompt, fair, and impartial investigation. The investigation should be thorough, and both parties should have the right to participate by identifying witnesses and identifying and/or providing relevant information to the investigator. Investigators should equally seek out both inculpatory and exculpatory evidence.

C.   **Confidentiality**

Schools should put in place provisions to guard against the improper disclosure of confidential information created or gathered during an investigation.  Parties, witnesses, investigators, decision-makers, and advisors should abide by these provisions. Schools should notify parties about the scope and limits of the school's ability to maintain confidentiality. For example, a school may have to provide documents in compliance with a court subpoena.

D.   **Retaliation**

Schools should put in place provisions to protect all parties from retaliation. Such provisions should be published to the campus community and available for review at all times. Such policies should also be communicated to all participants, including witnesses, throughout the investigative and adjudicatory process.  Such policies should also clearly communicate the means through which any individual can securely report perceived retaliation.

## II.   RESOLVING ALLEGATIONS OF SEXUAL MISCONDUCT

Schools have several options for resolving allegations of sexual misconduct.

### A.   <u>Alternatives to Traditional Adjudication</u>

Where appropriate, the Task Force encourages schools to consider non-mediation alternatives to resolving complaints that are research or evidence-based, such as Restorative Justice processes. Both parties must freely and voluntarily agree to such processes in order for them to be utilized, and they may withdraw their consent to the process at any time, stopping its use.

### B.   <u>Adjudicatory versus Investigatory Model</u>

Both the adjudicatory and the investigatory model begin with an investigation, but they differ in the process for determining whether a violation of school policy occurred. The adjudicatory model has a hearing in which both parties are entitled to be present, evidence is presented, and the decision-maker(s) determine(s) whether a violation of school policy has occurred. This does not require the parties to be present in the same room.  For instance, the parties could be in two separate rooms but able to see and hear each other via video-conferencing. The Task Force emphasizes that the decision-maker(s) should be able to see and hear the parties in order to assess their credibility, and at a minimum, the parties should be able to hear one another.

In the investigatory model, by contrast, the decision-maker(s) consider(s) only the investigation report in determining whether a violation occurred. Sometimes the investigator is also the decision-maker (the single investigator model), and sometimes the decision-maker is different from the investigator. Although the decision-maker(s) may sometimes request to hear from a witness, the parties are not entitled to be present for that testimony in the investigatory model.

In considering the differences between the adjudicatory and investigatory model, the Task Force has a preference for the adjudicatory model because it can offset any potential for investigator bias, and it allows the decision-maker(s) to hear live testimony from the parties.  It was the consensus of the Task Force that the single investigator model, which consists of having an investigator also serve as the decision-maker, carries inherent structural fairness risks especially as it relates to cases in which suspension or expulsion is a possibility. Should a school choose to use the investigatory model, the Task Force recommends that the investigator and the decision-maker be different persons and adopt additional procedural protections consist with these recommendations.

The Task Force acknowledges that some schools use a hybrid model, which contains elements of both the investigatory and adjudicatory model. For classification purposes, the Task Force considers a model adjudicatory only if the parties have the right to a hearing in which evidence is presented, the parties are present, and a decision-maker who is not also the investigator determines whether a violation occurred. As described in Section IV below – if there are at least

three decision-makers and they are making their decision unanimously - it is appropriate to use the lower standard of proof as defined in Section IV-D.

## III. PROCEDURAL PROTECTIONS

The Task Force believes that both parties should have robust procedural protections.

### A.     Counsel/Advocate

The Violence Against Women Authorization Act of 2013 requires that in cases of sexual assault, both parties have the right to an advisor of their choosing, who may be an attorney or third party advocate. All advisors, including attorney advisors, must adhere to all conditions and obligations required by the school's process. The school should provide the advisor with the same access to information available to the party. Minimally, the advisor should have the right to communicate with the party in oral or written form during all meetings and proceedings. Should a party prefer, the school should provide the party with an advisor who has been trained in the school's sexual misconduct policies and can assist the party. The school should have more than one advisor to give the party choice, but is not required to provide an attorney advisor. Where a student is working with an advisor and that advisor has an obligation to report to the university, the student should be made aware of the potential conflict of interest.

### B.     Notice

Both parties should be provided with written notice as contemporaneously as is practical that a school or its designated investigator will commence a formal investigation. This notice should include the date of the alleged incident if known, a summary of the alleged facts, a summary of the specific policy violation(s) under investigation by the school, and instructions on how to access the relevant policy and adjudicatory process. It should also include information about their right to an advisor, described above. This notice should be provided before the investigation begins. If the initial complaint is made to the school investigator then notice should be provided before the responding party's interview with the investigator, regardless of whether the responding party decides to make a statement.

### C.     Discovery

The school should prepare an initial comprehensive investigation report and should notify both parties contemporaneously of the availability of the report. This report should include information such as party statements, witness statements, and any inculpatory or exculpatory information collected during the investigation. Schools should disclose a list of information obtained during the course of the investigation even if it was not considered relevant evidence for the decision-maker(s). Both parties should have a reasonable opportunity to review the report with their advisor, if they choose to have one, and to request information be included or removed by the school from the final report. The school should designate a person other than the investigator or the decision-maker(s) to determine which information is included in the final

report, taking into consideration the issues raised by each party and school policy. The student's advisor, if there is one, should have the right to participate fully in this pre-hearing stage of the process. Once the final investigation report is prepared, both parties and their advisors, if they have them, should have reasonable access to it and should have the right to provide a reasonable written response, which will be provided along with the final investigation report to the decision-maker(s) for consideration of whether a policy violation has occurred. This reasonable written response should not reference any evidence that has been formally excluded from the final investigation report, however either party may always appeal the improper exclusion of evidence from the final investigation report.

**D.** **Impartial Decision-maker**

As a matter of fundamental fairness, schools and their designated personnel must be fair, impartial, and free of conflicts of interest. Both the investigator and the decision-maker(s) should receive fair and balanced training on how to objectively investigate and adjudicate these matters. Parties should be advised of the identity of the designated personnel in advance of decision-making so that they have sufficient time to raise concerns so as to avoid unnecessary delay and error.

**E.** **Silence**

In the interest of fundamental fairness, and recognizing the prospects of parallel or follow-on criminal proceedings, the respondent's silence should not be the basis of a finding of responsibility. The Task Force emphasizes that as long as it comports with the standards articulated in Section III-C and Section IV-D below, the complainant's statement may serve as the sole basis for a finding of responsibility.

**F.** **Appeal**

The Task Force recommends that both parties have a right to appeal. The grounds for appeal should be limited to (1) new information not known or available at the time of the hearing; (2) procedural error that materially affected the findings of fact (this includes improperly excluding or including evidence); (3) the imposition of a sanction disproportionate to the findings in the case (that is, too lenient or too severe); or (4) the conduct as found by the decision-maker does not violate school policy (this is not intended to allow an appeal for new fact-finding). A successful appeal on the first two grounds should generally result in a remand for a new hearing to determine whether a violation occurred. If the appellate officer finds the fourth ground to be true then the finding of responsibility should simply be reversed. Recognizing the benefits of finality, the Task Force favors a single level of direct/formal appeal.

**IV.** **THE HEARING**

The Task Force recommends an adjudicatory hearing to determine whether the respondent committed sexual misconduct.

A.     <u>**Standards for Evidence at Hearing**</u>

In general, evidence may be presented during a hearing if it is relevant, not unduly repetitious, and the sort of information a reasonable person would find reliable. Evidence is relevant if (1) it bears on a fact of consequence in the case, or (2) it reflects on the credibility of a testifying party or witness in a material way. Evidence may be excluded if it is unfairly prejudicial or if it is needlessly duplicative. Character and reputation evidence regarding the parties (both positive and negative) should be excluded from the decision-making stage. Evidence of the past sexual history of the parties should be disfavored and admitted only when it provides compelling evidence on a disputed issue of relevance to the misconduct charge or its defense.

It is appropriate for some witness statements to be presented in written form, such as a statement signed by the witness or as recorded by the investigator.  The decision-maker should exercise caution at considering second hand statements as true. ("John told me that he saw...") It is rare if ever appropriate to consider as true a third hand statement or something more removed.  ("John told me that Zelda told him that she saw…").

If a witness statement is important for establishing whether the alleged misconduct occurred then whenever possible, that witness should appear in person. Live testimony will allow the decision-maker to better assess witness credibility and determine whether a violation occurred.  Members of the college community (other than the parties themselves as explained in Section C below) have an obligation to provide relevant evidence if called upon to do so.

B.     <u>**Recording Proceedings**</u>

The hearing should be recorded or transcribed. Reasonable care should be taken to create a quality recording and minimize technical problems.

C.     <u>**Participation in the Proceedings**</u>

Neither the complainant nor the respondent should be required to participate in the proceedings. However, the decision-maker(s) should not consider either party's personal account of what happened unless that party is available for questioning by the decision-maker(s) and the other party. A party who chooses to remain silent may still present evidence (other than a personal statement) or question the evidence that is presented by the school or the other party. The decision-maker(s) may always consider a party's evidence and questioning of the evidence as well as a party's general denial of the allegations.

D.     <u>**Asking Questions**</u>

The complainant and respondent may not question one another or other witnesses directly, but should be given an ongoing opportunity during the proceeding to offer questions to be asked through the decision-maker(s), who will determine whether to ask them.  The investigator should be available for questioning by the decision-maker(s) and the parties.

## V.   DETERMINING WHETHER A VIOLATION OCCURRED

Regardless of the method a school uses to determine whether a violation occurred, the Task Force urges that the following protections be put in place.

### A.   Composition of Panel

Recognizing that there are different models that could provide for a fair and equitable resolution, the Task Force favors having at least three people separate from the investigator decide whether a violation occurred. The Task Force recognizes that there are inherent benefits to having a diverse panel when deciding responsibility or sanctions. A panel can be diverse across a number of dimensions including gender, race, age, sexual orientation, and position within the university. The inclusion of students can also provide an important perspective.

### B.   Necessary Vote for Finding of Responsibility

Schools should require a unanimous vote among decision-makers for a finding of school policy violation and a finding of responsibility.

### C.   Insufficient Evidence and Outcome

If there is insufficient credible, reliable, and relevant evidence for the decision-maker(s) to find that a violation occurred then the student must be found not responsible.

### D.   Standard of Proof

The Task Force spent considerable time discussing the standard of proof to be used by decision-maker(s) in determining whether a violation has occurred. Some Task Force members thought it was unfair to have a lower standard of proof when respondents were facing suspension and possible expulsion, coupled with the potential collateral consequences that accompany a finding of responsibility. Other Task Force members considered it unjust to have an elevated standard of proof given the historical challenges complainants often faced in getting schools to respond adequately to allegations of sexual misconduct. For purposes of the school disciplinary system, everyone was in agreement that the standard should not be beyond a reasonable doubt. Additionally, the preconceived notions attached to the commonly used standards of proof troubled some Task Force members.  Specifically, some Task Force members did not agree with the common interpretation of "preponderance of the evidence" as requiring a mechanical weighing of the evidence in which a mere feather is enough to tip the scales towards a finding of responsibility. At the same time, other Task Force members felt "clear and convincing evidence" is a vague standard and thus easily subject to potential abuse. In light of these concerns, the Task Force believes that it is best to avoid labels and instead articulate the appropriate basis for a finding of responsibility, with corresponding instructions (preferably in written form) provided to the decision-maker to ensure a clear understanding of the manner in which they should consider,

review, and weigh the evidence. The Task Force's recommendation is the product of compromise.

The Task Force believes that the following standard of proof is only appropriate under an adjudicatory model with at least a three-person panel of decision-makers, using a unanimity requirement, and with the procedural protections set forth in these recommendations. The Task Force recommends that this standard be provided in written form to the decision-makers and the parties and advisors, if there are any, before deliberations begin:

> *The decision-makers should first evaluate the quality of the evidence. The decision-makers should consider all of the evidence regardless of who provided it. Any evidence the decision-makers find to be of high quality should be given more weight than any evidence the decision-makers find to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-makers should only find the respondent responsible for alleged misconduct if the evidence unanimously convinces them to reasonably conclude that a finding of responsibility is justified. That is, the decision-makers should find that there is sufficient evidence that is relevant, probable, and persuasive to convince them that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

In a model where there is only one decision-maker, the Task Force believes that there should be a higher standard of proof. (The Task Force acknowledges that this recommendation is not in line with the 2011 Dear Colleague Letter). The Task Force recommends that this higher standard of proof be provided in written form to the decision-maker before deliberations begin.

> *The decision-maker should first evaluate the quality of the evidence. The decision-maker should consider all of the evidence regardless of who provided it. Any evidence the decision-maker finds to be of high quality should be given more weight than any evidence the decision-maker finds to be of low quality. Quality may, or may not be identical with quantity, and sheer quantity alone should not be the basis for a finding of responsibility. The testimony of a single party or witness may be sufficient to establish a fact.*

> *After assessing the quality of the evidence, the decision-maker should only find the respondent responsible for alleged misconduct if the evidence firmly convinces the decision-maker to reasonably conclude that a finding of responsibility is justified. That is, the decision-maker should find that there is sufficient evidence that is relevant, probable, and persuasive to firmly convince him or her that the respondent engaged in the alleged misconduct, and that the evidence supporting a finding of responsibility significantly outweighs any evidence that the respondent is not responsible for the alleged misconduct.*

**E.**     <u>**Sanction**</u>

In the event of a finding of responsibility, the consensus of the Task Force is that a particular sanction should not be presumed or required. Instead, the Task Force proposes that sanctioning should be decided on an individualized basis taking into account the facts and circumstances including mitigating factors about the respondent, the respondent's prior disciplinary history, the nature and seriousness of the offense, and the effect on the victim and/or complainant as well as the university community. The Task Force believes that a presumption of expulsion may have unintended consequences such as discouraging reporting and a finding of responsibility.

**REPORT**

**ABA CRIMINAL JUSTICE SECTION**

**TASK FORCE ON COLLEGE DUE PROCESS RIGHTS AND VICTIM PROTECTIONS**

The 2015 AAU Campus Climate Survey found 1 in 4 women surveyed from 27 Institutes of Higher Education (IHEs) had been raped or sexually assaulted while in college.[1] Although the authors cautioned that the results were not nationally representative,[2] they were consistent with a 2007 National Institute of Justice funded study that found 1 in 5 women at two large public universities had been similarly victimized.[3] In 2011, the Department of Education Office for Civil Rights (OCR) issued its Dear Colleague Letter (DCL), in which it called the statistics on sexual violence "deeply troubling and a call to action for the nation."[4] OCR was responding to a culture in which some schools weren't taking victims seriously and sometimes even dissuading them from pursuing charges.[5] After reminding universities that sexual violence constitutes a form of discrimination under Title IX,[6] OCR told universities that in order to be in compliance with Title IX, they had to change disciplinary proceedings to more effectively hold offenders accountable.[7]

Some applaud OCR's efforts[8]-including at least ninety professors who signed a White

---

[1]   See DAVID CANTOR ET AL., REPORT ON THE AAU CAMPUS CLIMATE SURVEY ON SEXUAL ASSAULT AND SEXUAL MISCONDUCT, 23–26 (2015), https://www.aau.edu/uploadedFiles/AAU_Publications/AAU_Reports/Sexual_Assault_Campus_Survey/AAU_Campus_Climate_Survey_12_14_15.pdf.

[2]   Id. at xv.

[3]   See CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY vii (2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. A 2016 Bureau of Justice Statistics Campus Climate Survey studied the frequency of unwanted sexual contact in the 2014-2015 academic year among undergraduates at nine institutions of higher education (IHEs). See CHRISTOPHER KREBS ET AL., BUREAU OF JUSTICE STATISTICS RESEARCH AND DEVELOPMENT SERIES, CAMPUS CLIMATE SURVEY VALIDATION STUDY FINAL TECHNICAL REPORT (2016), https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf. Krebs et al. found that the prevalence rate for completed sexual assault among undergraduate females averaged 10.3% across the nine IHEs, with a range of 4.2%-20%. Sexual assault included completed sexual battery (prevalence rate averaged 5.6% across the nine IHEs) and completed rape (prevalence rate averaged 4.1% across the nine IHE's). 2016 CAMPUS CLIMATE SURVEY at 69. Researchers also estimated the prevalence rate for completed sexual assault since entering undergraduate school and across lifetime, but they urged caution in interpreting these results. Id. at 73.

[4]   Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, to Colleague 2 (Apr. 4, 2011) [hereinafter Dear Colleague Letter], http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

[5]   See Kristen Lombardi, A Lack of Consequences for Sexual Assault, CTR. FOR PUB. INTEGRITY (Feb. 24, 2010, 12:00 PM), http://www.publicintegrity.org/2010/02/24/4360/lack-consequences-sexual-assault; Kayla Webley, Big Shame on Campus, MARIE CLAIRE (Oct. 16, 2013), http://www.marieclaire.com/politics/news/a8217/big-shame-on-campus/; Vanessa Grigoriadis, Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault, N.Y. MAG.: THE CUT (Sept. 21, 2014), http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html.

[6]   Dear Colleague Letter, supra note 4 at 1.

[7]   Id. at 1–3, 7–14.

[8]   See Lavinia M. Weizel, Note, The Process That is Due: Preponderance of the Evidence as the Standard of Proof for University Adjudications of Student-on-Student Sexual Assault Complaints, 53 B.C. L. REV. 1613, 1642–55 (2012); Amy Chmielewski, Note, Defending the Preponderance of the Evidence Standard in College Adjudications of Sexual Assault, BYU EDUC. & L.J. 143, 149–56 (2013).

Paper in support of the DCL[9]-for raising the profile of the harm often suffered by victims of sexual assault and forcing schools to confront the issue on campuses. Others contend that OCR's enforcement approach was too heavy-handed and that, in an effort to appease OCR, universities have not provided sufficient procedural protections to the accused.[10] For example, members of the law faculty at both Harvard and the University of Pennsylvania have publicly called for greater procedural rights for accused students.[11] The popular press has also started to shine a spotlight on the experiences of men who say their universities never gave them a meaningful chance to defend themselves before finding them responsible for sexual misconduct and expelling them.[12] Even OCR and the Department of Justice have on occasion found that a school did not provide sufficient procedural protection to an accused student.[13]

Historically, courts for the most part have sided with schools. Writing for the majority in

---

[9]   Katherine K. Baker, Deborah L. Blake & Nancy Chi Cantalupo, et al., Title IX and the Preponderance of the Evidence: A White Paper, FEMINIST LAW PROFESSORS (Aug. 4, 2016), http://www.feministlawprofessors.com/wp-content/uploads/2016/08/Title-IX-Preponderance-White-Paper-signed-10.3.16.pdf.

[10]   See William A. Jacobson, Accused on Campus: Charges Dropped, But the Infamy Remains, LEGAL INSURRECTION (May 16, 2015, 8:30 PM), http://legalinsurrection.com/2015/05/accused-on-campus-charges-dropped-but-the-infamy-remains/; see also Naomi R. Shatz, Feminists, We Are Not Winning the War on Campus Sexual Assault, HUFFINGTON POST (Oct. 29, 2014, 6:44 PM), http://www.huffingtonpost.com/naomi-shatz/feminists-we-are-not-winn_b_6071500.html. See generally Stephen Henrick, A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses, 40 N. KY. L. REV. 49 (2013); Barclay Sutton Hendrix, Note, A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault in Campus Disciplinary Proceedings, 47 GA. L. REV. 591, 594 (2013); Ryan D. Ellis, Mandating Injustice: The Preponderance of the Evidence Mandate Creates a New Threat to Due Process on Campus, 32 REV. LITIG. 65, 80–81 (2013).

[11]   See Elizabeth Bartholet et al., Rethink Harvard's Sexual Harassment Policy, BOSTON GLOBE (Oct. 15, 2014), https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html; David Rudovsky et al., Open Letter from Members of the Penn Law School Faculty, Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities, PHILLY.COM (Feb. 18, 2015), http://media.philly.com/documents/OpenLetter.pdf.

[12]   See Tovia Smith, Some Accused of Sexual Assault on Campus Say System Works Against Them, NPR (Sept. 3, 2014, 3:31 AM), http://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them; see also Emily Yoffe, The College Rape Overcorrection, SLATE (Dec. 7, 2014, 11:53 PM),                                   http://www.slate.com/articles/double_x/doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_efforts.html; Teresa Watanabe, More College Men Are Fighting Back Against Sexual Misconduct Cases, L.A. TIMES (June 7, 2014, 6:15 PM), http://www.latimes.com/local/la-me-sexual-assault-legal-20140608-story.html.

[13] See United States Department of Education ("DOE") Office for Civil Rights ("OCR"), Letter of Resolution in Wesley    College,    OCR    Complaint    No.    03-15-2329    (Sept.    30,    2016).    (available    at https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-b.pdf) (finding that Wesley College violated Title IX by failing to provide accused students with essential procedural protections, not adhering to the safeguards provided for in its own disciplinary policies and procedures; and not providing the accused student a full opportunity to respond to the complaint, rebut the allegations, or defend himself at his hearing). See also United States Department of Justice Civil Rights Division, Letter re Title IX and Title IV Investigation of University of New Mexico (April 22, 2016) (available at https://www.justice.gov/crt/file/843926/download) (finding that the University of New Mexico's investigative process: failed to adequately inform respondents of the option to provide their own version of events or to help identify pertinent witnesses or evidence; lacked provisions requiring that complainants and respondents be provided regular updates regarding the investigation, which caused confusion and negatively impacted both students; and did not have adequate procedures in place to provide academic accommodations to respondent students that had been temporarily banned from campus for safety reasons).

P*iarowski v. Illinois Community College*, Judge Posner explained why: "We are reluctant to encourage further bureaucratization by judicializing university disciplinary proceedings, mindful also that one dimension of academic freedom is the right of academic institutions to operate free of heavy-handed governmental, including judicial, interference."[14] Recently, however, in the wake of intensifying accused student litigation, courts across the country have started finding that aspects of the procedures and practices used at a number of schools to investigate and adjudicate reports of sexual misconduct violate principles of fundamental fairness, and in the case of public institutions, procedural due process.[15] For instance, on March 31, 2016, the Massachusetts District Court ruled in favor of a Brandeis University student who had been found responsible for "serious sexual transgressions."[16] The court wrote, "Brandeis appears to have substantially impaired, if not eliminated, an accused student's right to a fair and impartial process."[17] The court was particularly troubled by the deprivation of the right to cross-examine the complainant[18] as well as the lack of notice about the underlying allegations.[19]

This Task Force was created to evaluate and address procedural protections for both victims and the accused. It was comprised of a diverse assortment of leading figures who together represented the interests of all of those at the table: victims, the accused, universities, and others. The Task Force's job was to come up with a set of recommendations that would protect the due process rights of the accused while also protecting the rights of victims. Despite the enormous undertaking (and some might say potential for irreconcilable differences), the Task Force was able to reach consensus on a set of recommendations. In so doing, the Task Force expounds upon the work previously undertaken by the ABA Commission on Domestic & Sexual Violence in 2015. This report provides some additional clarification and discussion to our recommendations.

## I.   Schools Rights and Responsibilities

### A.   Cooperation and Independence from law Enforcement

Some have suggested that universities should not adjudicate allegations of campus sexual assault or that the criminal justice system should take the lead. A recent bill in Georgia, for

---

[14] Piarowski v. Illinois Community College Dist. 515, 759 F.2d 625, 629 (7th Cir.1985).

[15] See Jake New, Court Wins for Accused, INSIDE HIGHER EDUC. (Nov. 5, 2015), https://www.insidehighered.com/news/2015/11/05/more-students-punished-over-sexual-assault-are-winning-lawsuits-against-colleges. Some argue that because of the coercive actions of OCR, private schools have become state actors, which means that those students are entitled to the same constitutional rights as students at a public university. See Tamara Rice Lave, A Critical Look at how Top Colleges and Universities Are Adjudicating Sexual Assault, 71 U MIAMI L. R. 276 (2017).

[16] Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *4 (D. Mass. Mar. 31, 2016).

[17] Id. at *6.

[18] Id. at *33–35 ("While protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection for the rights of the accused raises profound concerns. . . . Here, there were essentially no third-party witnesses to any of the events in question, and there does not appear to have been any contemporary corroborating evidence. The entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding.").

[19] Id. at *33–34.

instance, would have forbidden schools from handling campus sexual assault unless and until there was a criminal investigation.[20] The Task Force was concerned that if a campus proceeding were tied to the criminal justice system that many instances of sexual misconduct would never be addressed. The Task Force believes it is appropriate for schools to resolve allegations of campus sexual misconduct for the protection and betterment of the campus community, as long as they do so fairly.

### B. Investigation

Advocates for complainants and respondents have both experienced schools not conducting a prompt, fair, and impartial investigation. All Task Force members agreed that it was critical for schools to fully and fairly investigate both sides of a complaint of sexual misconduct.

### C. Confidentiality

The Task Force spoke at length about issues regarding confidentiality. The Task Force wanted to ensure that the parties had access to necessary information in order to fairly adjudicate their case, but at the same time, it wanted to protect against confidential information being improperly distributed or disclosed. The Task Force was also concerned about parties not understanding the limits of school confidentiality, and members agreed it was imperative that they be informed.

## II. Resolving Allegations of Sexual Misconduct

### A. Alternatives to Traditional Adjudication

The Task Force encourages schools to consider non-mediation alternatives to traditional adjudication such as restorative justice processes (RJ). The Task Force stresses that these alternatives should be research or evidence based and not simply a means or escape mechanism for schools to avoid fully and fairly resolving allegations of campus sexual misconduct. Since there is a lot of misunderstanding about restorative justice, this report will provide a brief description.[21] Before doing so, the Task Force wants to emphasize that RJ is only appropriate in certain circumstances, such as when the offender does not pose an immediate or ongoing danger. In addition, both parties must agree to participate in RJ, and should they withdraw their consent at any time, the process must be stopped.

As Tom Tyler explains: "Restorative Justice argues that the social goal that should dominate reactions to transgressions is to resolve the dispute via reintegrative shaming

---

[20] Jeremy Bauer-Wolf, Who Should Investigate Sexual Assaults, INSIDE HIGHER ED, April 11, 2017; https://www.insidehighered.com/news/2017/04/11/controversial-georgia-sexual-assault-bill-prompts-debate-reporting.

[21] This section on restorative justice is taken in its entirety from the Task Force Reporter's article on campus sexual assault. Tamara Rice Lave, Ready, Fire, Aim: How Universities Are Failing the Constitution in Sexual Assault Cases 48 ARIZONA STATE LAW JOURNAL 637, 696-700 (2016).

[which] . . . combines strong disapproval of bad conduct with respect for the person who committed those bad acts. The goal is restoring victims, offenders and the community."[22] Unlike mediation, which treats parties as neutral, the starting point for RJ is that "harm has been done and someone is responsible for repairing it."[23] This distinction is important because the 1997 Guidance Document,[24] the 2001 Guidance Document,[25] and the 2011 Dear Colleague Letter[26] told schools that they could not use mediation in cases of sexual assault, even if voluntary.

Although RJ is geared towards reintegrating the transgressing student back into the community, it is also dedicated to helping the victim heal and move forward. "A consensus of published studies is that sexual assault victims need to tell their own stories about their own experiences, obtain answers to questions, experience validation as a legitimate victim, observe offender remorse for harming them, (and) receive support that counteracts isolations and self-blame."[27] RJ responds to these needs. In conferencing (the most widely used model of RJ), the first meeting begins with the responsible person (otherwise known as the respondent or the accused) describing and taking responsibility for what he did and the victim describing the impact of the violation.[28] Family and friends of both are present for support and are given the opportunity to explain the impact of the harm.[29] A written redress plan is later formalized that describes "the concrete means through which the responsible person will be held accountable and remedy the impacts on victims and the community."[30] This can include counseling (sex offender treatment, drug and alcohol interventions, and anger management), community service, and victim restitution.[31] A one-year supervision period is put in place to monitor the responsible person and make sure that he meets his commitments.[32]

RJ has been shown to be effective at lowering recidivism and empowering victims in both academic and non-academic settings. A 2014 study by David Karp and Casey Sacks compared outcomes across three different college disciplinary processes: model code (a term

---

[22]    See Tom R. Tyler, Restorative Justice and Procedural Justice: Dealing with Rule Breaking, 62 J. SOC. JUST. 307, 315 (2006).

[23]    Mary P. Koss et al., Campus Sexual Misconduct: Restorative Justice Approaches to Enhance Compliance with Title IX Guidance, 15 TRAUMA, VIOLENCE, & ABUSE 242, 246 (2014). Koss argues that this distinction is important: Judicial "responses to sexual misconduct must acknowledge and obviate the negative effects of societal and individual norms that operate to silence victims and create opportunities for reabuse. When someone has been harmed by another person, mediation that provides neutrality and treats parties as equal partners in the resolution process is inappropriate." Id. at 245–46. Koss also argues that because of this difference, colleges can adopt RJ and not be in violation of the DCL. Id. at 246.

[24]    Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, U.S. DEP'T OF EDUC., http://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html (last visited Nov. 7, 2016) [hereinafter Sexual Harassment Guidance 1997].

[25]    U.S. DEP'T OF EDUC. OFFICE OF CIVIL RIGHTS, U.S. DEP'T OF EDUC., REVISED SEXUAL HARASSMENT GUIDANCE: HARASSMENT OF STUDENTS BY SCHOOL EMPLOYEES, OTHER STUDENTS, OR THIRD PARTIES (2001) [hereinafter REVISED SEXUAL HARASSMENT GUIDANCE], https://www2.ed.gov/offices/OCR/archives/pdf/shguide.pdf   at 21.

[26] Dear Colleague Letter, supra note 4 at 2.

[27]    Koss et al., supra note 22, at 246–47.

[28]    Id. at 248.

[29]    Id.

[30]    Id.

[31]    Id.

[32]    Id.

used for the more traditional hearing conducted by a single hearing officer or panel),[33] restorative justice, and a combination of the two.[34] Karp and Casey used data from the STARR project, which has a total of 659 complete cases,[35] gathered from 18 colleges and universities across the United States[36] Although they cautioned that their results may be limited by the fact that they had few suspension-level cases, their findings showed that RJ provided a positive alternative to more traditional disciplinary proceedings. They "consistently found that restorative justice practices have a greater impact on student learning than model code hearings."[37]

Furthermore, RJ has been successfully adopted for juvenile sex offenses and adult sex crimes. RESTORE is one such program that uses conferencing, a widely used RJ methodology.[38] Mary Koss evaluated RESTORE using a sample of 66 cases involving sex crimes. Although caution is necessary due to the small sample size, the results are promising. Koss found that 63% of victims and 90% of responsible persons chose RJ; 80% of responsible persons completed all elements of their redress plan within one year (12 months), and post-conference surveys showed that in excess of 90% of all participants, including the victims, agreed that they felt supported, listened to, treated fairly and with respect, "and believed that the conference was a success."[39] Importantly, there were no incidents involving physical threats, and standardized assessments showed decreases in victim posttraumatic stress disorder symptoms from intake to post conference.[40]

Even if RJ is not used as an alternative resolution process, schools should consider using it as a complement to a formal adjudicatory hearing. Koss has outlined how this can be done.[41] For instance, it could be used to determine the appropriate sanction after a finding of responsibility has been made and/or as a reintegration process once the responsible student has finished his sanction.

**B. The Adjudicatory versus Investigatory Model**

The Task Force has a preference for the adjudicatory model versus the investigatory model because it allows for live testimony and it helps to offset bias. The Task Force was particularly concerned by the use of the single model investigatory model, in which the same person who investigates also determines whether a violation of school policy occurred.

---

[33]    David R. Karp & Casey Sacks, Student Conduct, Restorative Justice, and Student Development: Findings from the STARR Project: A Student Accountability and Restorative Research Project, 17 CONTEMP. JUST. REV. 154, 156 (2014). "The model code calls for a hearing process that is conducted by a single hearing officer or a volunteer board, often composed of students, faculty, and staff. While proponents of the model code highlight that the hearing is not a criminal trial, it has many of the similarities to the courtroom process." Id.
[34]    See id.
[35]    Id. at 162.
[36]    Id. at 160.
[37]    Id. at 169.
[38]    See Koss et al., supra note 22, at 248.
[39]    Id. (internal citation omitted).
[40]    Id.
[41]    See Koss et al., supra note 22, at 250, 252–53.

As the Supreme Court acknowledged in *Withrow v. Larkin* (1975), a "fair trial in a fair tribunal is a basic requirement of due process"[42] and it applies to both court cases and hearings before administrative agencies. [43] "Not only is a biased decisionmaker constitutionally unacceptable," the Court wrote, "but 'our system of law has always endeavored to prevent even the probability of unfairness.'"[44] Congress recognized the importance of role separation when it unanimously passed the Administrative Procedure Act (APA) in 1946.[45] The APA *specifically* bars an individual from performing both an investigatory and an adjudicatory role.[46]

### a.   *Implicit Bias*[47]

Part of the problem with putting everything in the hands of one person is that even an administrator with the best of intentions is almost certainly biased in some way.[48] This poses a concern not just for accused students but also the student who reports being the victim of sexual misconduct. Implicit biases (or unconscious stereotypes) have been shown to affect judgment and produce discriminatory behavior.[49] These include biases based on race, gender, ethnicity, nationality, social status, and weight.

### b.   *Confirmation Bias*[50]

Confirmation bias— the tendency for people to seek or interpret evidence in a manner that is partial to existing beliefs, expectations or an existing hypothesis[51]—poses a particular challenge to the fairness of the single-model investigatory model. Confirmation bias has "proven strikingly robust across diverse domains of human thinking, including logical problem solving, social interaction and medical reasoning."[52]

Researchers have also shown how confirmation bias can infect criminal investigations. Kassin, Goldstein and Savitsky (2003) demonstrated that interrogators who had been cued to believe that most suspects were guilty chose more guilt-presumptive questions, used more

---

[42]   Withrow v. Larkin, 421 U.S. 35, 46 (1975) (quoting In re Murchison, 349 U.S. 133, 136 (1955)).

[43]   Gibson v. Berryhill, 411 U.S. 564, 579 (1973).  This paragraph was taken from Ready, Fire, Aim supra note 19 at 672.

[44]   Withrow, 421 U.S. at 47 (quoting In re Murchison, 349 U.S. at 136).  The Task Force acknowledges that Court has held that combining investigatory and adjudicatory functions does not necessarily violate due process, but the cases in which it upheld the combination of functions differ in important ways from the university proceedings at issue here.  See Lave, supra note 20 at 673-674.

[45]   See Walter Gellhorn, The Administrative Procedure Act: The Beginnings, 72 VA. L. REV. 219, 231–32 (1986) (internal citations omitted). The Task Force thanks Ed Rubin for this point.

[46]   See Administrative Procedure Act, 5 U.S.C. §§ 554 (d)(2), 557 (2012).

[47]   This section on implicit bias was taken from Ready, Fire, Aim, supra note 20 at 674-75.

[48]   For a comprehensive overview of studies showing bias in the courtroom, see Jerry Kang et al., Implicit Bias in the Courtroom, 59 UCLA L. REV. 1124 (2012).

[49]   See John T. Jost et al., The Existence of Implicit Bias is Beyond Reasonable Doubt: A Refutation of Ideological and Methodological Objections and Executive Summary of Ten Studies that No Manager Should Ignore, 29 RESEARCH ORG. BEHAV. 39, 51 (2009).

[50] This section on confirmation bias is taken from Ready, Fire, Aim, supra note 20 at 676-77.

[51]   Raymond S. Nickerson, Confirmation Bias: A Ubiquitous Phenomenon in Many Guises, 2 REV. GEN. PSYCHOL. 175, 175 (1998).

[52]   Karl Ask et al., The 'Elasticity' of Criminal Evidence: A Moderator of Investigator Bias, 22 APPLIED COGNITIVE PSYCHOL. 1245, 1246 (2008) (internal citations omitted).

interrogation techniques (including the presentation of false evidence), were more aggressive in questioning innocent suspects, and more likely to view a suspect as guilty.[53] They also found that an interrogator's presumption of guilt affected the behavior of those being questioned and made impartial observers more likely to judge them guilty.[54] Ask and Granhag (2007) found that experienced investigators judged witness statements differently depending on whether the statement was consistent or inconsistent with their initial theory.[55] Although Ask, Rebelius, and Granhag showed that investigators will be more receptive to certain kinds of evidence (such as DNA), the kind of evidence that is most likely to be proffered at college adjudicatory hearings, witness testimony, is the most subject to confirmation bias.[56]

Confirmation bias means that the accused student is unlikely to be treated fairly when the same person who is conducting the investigation will also be rendering the final determination in the case. As the court explained in *Doe v. Brandeis University*:

> The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions.[57]

## IV.   The Hearing

### C.  Participation in the Proceedings

The Task Force's recommendations for admissibility of personal statements are modeled on a defendant's Sixth Amendment confrontation rights (testimonial statements are inadmissible unless the declarant is unavailable and has been subject to prior cross examination)[58] and the federal rules of evidence (a defendant cannot simply admit his own prior statement about what happened).[59] Importantly, The Task Force's recommendations provide less opportunity for confrontation than is provided by the Sixth Amendment, however they do provide for the opportunity for both parties to ask questions through the hearing chair.  In addition, they do not allow either side to present their personal statement about what occurred unless they are willing to be questioned by both the school and indirectly by the other party.

---

[53]   Saul M. Kassin, Christine C. Goldstein & Kenneth Savitsky, Behavioral Confirmation in the Interrogation Room: On the Dangers of Presuming Guilt, 27 L. & HUM. BEHAV. 187, 187 (2003).

[54]   Id.

[55]   Karl Ask & Par Anders Granhag, Motivational Bias in Criminal Investigators' Judgments of Witness Reliability, 37 J. APPLIED SOC. PSYCHOL. 561, 579 (2007).

[56]   Karl Ask et al., supra note 54, at 1257–58.

[57]   Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *36 (D. Mass. Mar. 31, 2016).

[58]   Crawford v Washington 541 U.S. 36 (2004).

[59]   See U.S. v Phelps 572 F. Supp. 262, 265 (E.D. Ky. 1983) ("The statement of a party may be introduced as an admission only when offered against that party. This principle is reflected by the standard but often unanalyzed objection that such testimony by a party constitutes a 'self-serving declaration.'")

### D.  Asking Questions[60]

Part of the reason why the Task Force prefers the adjudicatory method is because it gives the decision-maker(s) the opportunity to hear live testimony, both from the parties and from witnesses. Not giving the accused the right to question his accuser seriously impairs his right to a fair and accurate determination of responsibility. In *Goldberg v. Kelley* (1970), the Supreme Court wrote that in almost every proceeding "where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."[61] The right to ask questions is not a mere formality; the Court has called cross-examination "the 'greatest legal engine ever invented for the discovery of truth'."[62] As the court in *Doe v. Brandeis University* explained, cross-examination is particularly important in credibility contests where there are no witnesses or other extrinsic evidence.[63]

Social science research supports the importance courts and the Task Force place in cross-examination. Although researchers have shown people are not very good at judging a person's veracity based on his demeanor,[64] cross-examination is still an important vehicle for discerning truth.[65] This is because a witness's cognitive limitations make it demonstrably more difficult for him to consistently answer spontaneous questions under live cross-examination if he is being insincere.[66] In addition, there is certain observable behavior that has been linked to deception, such as vocal tension and pitch.[67] At least one study has shown that subjects are more than twice as effective at detecting deception when they are able to observe a speaker's body and hear his voice as opposed to simply reviewing a written transcript.[68]

Although the Task Force recognizes the importance of questioning, it also acknowledges the value of protecting victims from unnecessary trauma.[69] The Task Force believes that

---

[60]   This section on asking question is taken from Ready, Fire, Aim supra note 20 at 678-80.

[61]   Goldberg v. Kelly, 397 U.S. 254, 269 (1970).

[62]   Lilly v. Virginia, 527 U.S. 116, 124 (1999) (quoting California v. Green, 399 U.S. 149, 158 (1970)).

[63]   Doe v. Brandeis Univ., No. 15-11557-FDS, 2016 WL 1274533, at *35 (D. Mass. Mar. 31, 2016).

[64]   See Aldert Vrij, Why Professionals Fail to Catch Liars and How They Can Improve, 9 LEGAL & CRIMINOLOGICAL PSYCHOL. 159, 166-167 (2004); see also Bella M. De Paulo et al., Cues to Deception, 129 PSYCHOL. BULL. 74 (2003) (conducting a meta-analysis of 120 independent samples and finding that behavior commonly associated with deception such as unwillingness to maintain eye contact were not in fact related).

[65]   See Raymond LaMagna, Note, (Re)Constitutionalizing Confrontation: Reexamining Unavailability and the Value of Live Testimony, 79 S. CAL. L. REV. 1499, 1506 (2006).

[66]   Chris William Sanchirico, Evidence, Procedure, and the Upside of Cognitive Error, 57 STAN. L. REV. 291, 332–44 (2004).

[67]   See De Paulo et al., supra note 66 at 95–96.

[68]   See Michael J. Saks, What Do Jury Experiments Tell Us About How Juries (Should) Make Decisions, 6 S. CAL. INTERDISC. L.J. 1, 21–22 (1997).

[69]    Some researchers reported that criminal proceedings are a negative experience for victims, calling them "disruptive" (Patricia Cluss et al., The Rape Victim: Psychological Correlates of Participation in the Legal Process, 10 CRIM. JUST. & BEHAV. 342, 354 (1983)), "hurtful" (Rebecca Campbell et al., Preventing the "Second Rape": Rape Survivors' Experiences with Community Service Providers, 16 J. INTERPERSONAL VIOLENCE 1239, 1250 (2001)), or "suggest[ing] that [they] are frequently a source of secondary victimization for the crime victims involved" (Uli Orth, Secondary Victimization of Crime Victims by Criminal Proceedings, 15 SOC. JUST. RES. 313, 321 (2002)).  Others studies came to a different conclusion about the effect of legal proceedings on victim well-being.  Frazier and Haney found that victims had a negative impression of the legal system, but their "findings [did] not support the belief that victims experience a 'secondary victimization' due to their involvement with the criminal

allowing questions to be asked through the decision-maker balances these two important interests. Although the Task Force recognizes that such a process interrupts the spontaneity of direct questioning, it has the benefit of having an independent person assess whether the question is relevant and appropriate. It also removes the potential trauma from having a victim be directly questioned by her assailant. Although such a barrier may not be appropriate in the criminal justice context, the Task Force believes it is appropriate in the school context.

## V.   Determining whether a violation occurred

### A. Composition of Panel[70]

The Task Force was concerned by how bias can undermine fair decision-making. Specialized training has been shown to reduce bias[71] as has a longstanding and deep personal commitment to eradicating personal bias.[72] Ironically, the commitment to be objective may just exacerbate the problem. Studies have shown that subjects who profess to be objective are more likely to make biased decisions.[73]

Changing the context in which people are rendering decisions, however, may be the most effective way of promoting objectivity. Specifically, a larger and more diverse hearing body has been shown to increase the quality of deliberation and reduce bias. One study looked at the effects of having a racially homogeneous versus a heterogeneous jury.[74] It found that on every relevant measure, racially heterogeneous groups outperformed homogeneous ones. Not only did racially diverse groups spend more time deliberating, but also they discussed a wider range of case facts and personal perspectives. They also made fewer factual errors than all-white juries.[75] It is for these and other reasons that the Task Force recommends that there be at least three decision-makers who determine whether a violation occur and that the panel be diverse.

## Conclusion

Adjudicating campus sexual assault is a high stakes event. If a school finds a person responsible for sexual misconduct who did *not* actually do it (i.e., a false positive), then that person will unfairly suffer potentially life-altering consequences. If, on the other hand, a school

---

justice system. (Patricia A. Frazier & Beth Haney, Sexual Assault Cases in the Legal System: Police, Prosecutor, and Victim Perspectives, 20 LAW & HUM. BEHAV. 607, 620, 626) (1996)).

[70]   This discussion on Composition of Panel is taken from Ready, Fire, Aim supra note 20 at 675.

[71]   See Kang et al., supra note 47 at 1227.

[72]   Gordon B. Moskowitz et al., Preconsciously Controlling Stereotyping: Implicitly Activated Egalitarian Goals Prevent the Activation of Stereotypes, 18 SOC. COGNITION 151, 155 (2000).

[73]   Eric Luis Uhlmann & Geoffrey L. Cohen, "I Think It, Therefore It's True": Effects of Self-Perceived Objectivity on Hiring Discrimination, 104 ORGANIZATIONAL BEHAV. & HUM. DECISION PROCESSES 207, 210–11 (2007).

[74]   Samuel R. Sommers, On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations, 90 J. PERSONALITY & SOC. PSYCHOL. 597, 597 (2006).

[75]   A diverse hearing body has another benefit. Ultimately, whoever is deciding the case must assess the credibility of witnesses, which can be difficult when people come from different cultures. See Vrij, supra note 66 at 167.

finds a person not responsible who *did* commit the misconduct (i.e., a false negative) then the school has deprived a victim of justice and potentially endangered the entire community.

With stakes this high, the Task Force agreed that fair processes are critical. Advocates for victims want to ensure that schools don't simply dismiss them as untruthful, and advocates for respondents want to make sure that schools don't just assume that they are guilty. Similarly, representatives of schools want to keep their communities safe, while at the same time having processes that minimize mistakes.  All agreed that the best way to achieve this fair and objective approach was by having the school fully and fairly investigate both sides of the story and then provide an impartial forum for determining what occurred.

The Task Force believes that these recommendations go far towards achieving these goals. The Task Force recognizes that colleges and universities are not all alike, and that limited resources may constrain the ability of schools to follow some of these recommendations. The Task Force hopes, however, that it has provided a clear path for colleges and universities to fully and fairly adjudicate allegations of campus sexual misconduct – or at least strive earnestly to do so.

## **Task Force Participants**

### **Chair**

**Andrew S. Boutros**
Partner & National Co-Chair White Collar, Internal Investigations & False Claims Team
Seyfarth Shaw LLP
Chicago, IL & Washington D.C.

### **Reporter**

**Tamara Rice Lave**
Associate Professor of Law, University of Miami
Coral Gables, FL

### **Members**

**Pamela J. Bernard**
Vice President & General Counsel, Duke University
Durham, NC

**Caroline Bettinger-Lopez**
Professor of Clinical Education & Director, Human Rights Clinic, University of Miami
Coral Gables, FL

**Robert M. Cary**
Partner, Williams & Connolly
Washington D.C.

**Laura L. Dunn**
Executive Director & Founder, SurvJustice
Washington D.C.

**Cynthia P. Garrett**
Co President, Families Advocating for Campus Equality (FACE)
San Diego, CA

**Marcos E. Hasbun**
Partner, Zuckerman Spaeder LLP
Tampa, Florida

**Janet P. Judge**
President, Sport Law Associates, LLC
Boston, MA

**Bridget M. Maricich**
Counsel, Seyfarth Shaw LLP
Boston, MA

**Robin Rachel Runge**
Professorial Lecturer in Law, George Washington University
Washington D.C.

**Lauren Schoenthaler**
Senior Associate Vice Provost for Institutional Equity and Access, Stanford University
Palo Alto, CA

**Brenda V. Smith**
Professor, American University, Washington College of Law
Washington D.C.

<u>**Liaison**</u>

**Mary P. Koss**
American Regents' Professor, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

**Elise Lopez**
Assistant Director, Relationship Violence Program, Mel and Enid Zuckerman College of Public Health, University of Arizona
Tucson, AZ

<u>**ABA Staff Liaison**</u>

**Patrice Payne**
Senior Staff Attorney, Criminal Justice Section
Washington D.C.