**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION AT LAFAYETTE**

| | | |
|---|---|---|
| JOHN DOE, | **)** | |
| | **)** | |
| Plaintiff, | **)** | |
| | **)** | |
| vs. | **)** | Case No: 4:19-CV-00056-TLS-JPK |
| | **)** | |
| THE TRUSTEES OF PURDUE UNIVERSITY, | **)** | |
| AND KATHERINE L. SERMERSHEIM, | **)** | |
| | **)** | |
| Defendants. | **)** | |

## DEFENDANTS' ANSWER AND COUNTERCLAIM

Defendants The Trustees of Purdue University ("Purdue") and Katherine L. Sermersheim ("Sermersheim") hereby respond to Plaintiff John Doe's Second Amended Complaint (ECF No. 70) as follows:

Plaintiff's footnotes do not comply with the requirement to state allegations "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Certain of Plaintiff's captions (specifically, "Roe's Consensual Sexual Encounter with Doe"; "The Bias That Caused Purdue Actors' Unlawful Discipline of Doe"; "Purdue's Refusal to Provide Doe Evidence of Purdue's GBE and BFSA"; and "Purdue Actors' Unlawful Investigation and Adjudication of Roe's False Allegations of Sexual Misconduct by Doe") likewise fail to comply with Rule 10(b). As such, no response is required to these footnotes or captions. To the extent that a response to any footnote is provided, such footnote is discussed in the relevant numbered paragraph below. To the extent that any footnote or caption contains an allegation to which a response is not provided, Defendants deny any and all such allegations.

<u>**NATURE OF THIS ACTION**</u>

1.      After a consensual sexual interaction between Purdue female student Jane Roe ("Roe")

and Doe on the evening of August 16, 2018 and the early morning hours of August 17, 2018,

Roe falsely told friends that Doe engaged in sexual misconduct. Roe's false allegations were

ultimately reported to Purdue who filed a University Initiated Complaint against Doe for

violating Purdue Policies by engaging in sexual misconduct with Roe on August 16th and 17th

of 2018. Purdue Senior Associate Director Ms. Christie Wright ("Wright") and Purdue

Investigator Mr. Jeff Rooze ("Rooze") conducted a biased and unfair investigation into those

allegations; and, as a result, Sermersheim; Purdue Vice President Alysa Christmas Rollock

("Rollock"); and Purdue employees Matthew W. Ohland ("Ohland"), Rodolfo Pinel ("Pinel"),

and Emily Stevenson ("Stevenson") improperly and unlawfully disciplined Doe for violating

Purdue Policies by expelling Doe. Ohland, Pinel, Stevenson, and Sermersheim are collectively

referred to as ("Adjudicators"). Purdue, Adjudicators, Wright, Rooze, and Rollock are

collectively referred to as ("Purdue Actors").

> **Answer:**      **Defendants admit that Purdue investigated allegations that Plaintiff John Doe committed physical and sexual violence against Jane Roe on or about August 16, 2018. Defendants further admit that Purdue concluded that John Doe violated Purdue's applicable rules by, among other things, sexually assaulting Jane Roe, and that John Doe was expelled from his enrollment at Purdue for this misconduct. Except as admitted, denied.**

2.      As detailed in this Complaint, Purdue's unlawful discipline of Doe is part of a troubling

trend among American universities which force students to pursue litigation to clear their names

and continue to pursue their educational and life goals.

> **Answer:**      **Denied.**

3.      Lawsuits seeking to remedy a university's biased application of Title IX policies

sometimes come too late. For example, at least two male students committed suicide after their

2

universities mishandled allegations that they engaged in sexual misconduct. *See e.g.*, Ashe

Schow, *She Accused Him Of Stalking After A One-Day Facebook Chat. The Campus Process*

*Led Him To Overdose, Lawsuit Claims.* (https://www.dailywire.com/news/44385/she-accused-

him-stalking-after-one-day-facebook-ashe-schow) (accessed May 22, 2019); Ashe Schow, *Texas*

*student   commits   suicide   after   Title   IX   Kangaroo   Court*,

(https://www.watchdog.org/issues/education/texas-student-commits-suicide-after-title-ix-

kangaroo-court/article_c16a55b7-0e53-5303-b39f-f5b4e4b834ae.html) (accessed May 22, 2019).

> **Answer:** **Paragraph 3 contains no allegations regarding Defendants, and so no response is required. To the extent that a response is required, Defendants state that they are without knowledge or information sufficient to form a belief as to any allegations that may be contained in Paragraph 3 and so deny the same.**

4.      The lawsuits filed by male students often trigger hostile reactions which *Brown Univ.*

discussed by noting:

> ". . . . the Court is an independent body . . . [that] cannot be swayed by emotion or public opinion. After issuing the preliminary injunction this Court was deluged with emails resulting from an organized campaign to influence the outcome. These tactics, while perhaps appropriate and effective in influencing legislators or officials in the executive branch, have no place in the judicial process. This is basic civics, and one would think students and others affiliated with a prestigious Ivy League institution would know this. Moreover, having read a few of the emails, it is abundantly clear that the writers, while passionate, were woefully ignorant about the issues before the Court. Hopefully, they will read this decision and be educated." *Doe v. Brown Univ.*, Case No. 16-017 S, 2016 WL 5409241 (D.R.I. Sept. 28, 2016).

> **Answer:** **Paragraph 4 contains no allegations regarding Defendants, and so no response is required. To the extent that a response is required, Defendants state that they are without knowledge or information sufficient to form a belief as to any allegations that may be contained in Paragraph 4 and so deny the same.**

5.      Like the decision in *Brown*, the facts detailed below make it abundantly clear Purdue

Actors violated Purdue Policies, and Doe's Title IX, due process, and equal protection rights by

creating a biased hostile environment against males, like Doe, based in part on Purdue's pattern

and practice of disciplining male students who engage in consensual sexual activity with female students.

**Answer:**      **Denied.**

6.      Purdue Policies created this hostile environment in part by violating Purdue Policies and Doe's Title IX and due process, and/or equal protection rights by creating a star chamber disciplinary process that:

a)      Barred Doe from reviewing Wright and Rooze's Final Report issued in support of Purdue's "University initiated investigation" of Doe ("Complainant's Concealed Report") even though the Adjudicators based their unlawful expulsion of Doe on Complainant's Concealed Report;

b)      Conducted a disciplinary hearing ("Panel Hearing") which prohibited Doe from asking questions of Roe or her witnesses;

c)      Expelling Doe based on surrogate and secret testimony contained in the Complainant's Concealed Report without giving Doe the opportunity to question Wright and Rooze about how their evidence was collected, what was left out, and/or bias associated with their representing Purdue's interest in the "University initiated investigation" of Doe;

d)      Allowing Roe, Wright and/or Rooze to provide live testimony to Adjudicators at the Hearing without: (i) telling Doe that Roe, Wright and/or Rooze would be presenting testimony; (ii) allowing Doe to hear Roe, Wright and Rooze's testimony; or (iii) making a transcript of Roe, Wright and Rooze's testimony available to Doe;

e)      Prohibited Doe from proving Wright and Rooze's initial report excluded exculpatory evidence of Doe's innocence by denying Doe access to Wright and Rooze's audio recordings of their interviews with Doe, Roe, and other witnesses;

f)      Eliminating Doe's ability to defend himself against the "University initiated investigation" of Doe by prohibiting the audio recording of the Panel Hearing so Doe could use this evidence in his subsequent appeal of his unlawful expulsion ("Appeal");

g)      Violating Doe's Title IX, due process and/or FERPA rights by giving Roe the following rights of a "complainant" even though she was not a "party" to the "University initiated investigation" of Doe: (i) right to review and respond to Wright and Rooze's initial report; (ii) provide testimony to the Adjudicators; and (iii) appeal the Adjudicators' decision;

h)      Prohibiting Doe from raising bias and/or conflict of interest challenges regarding the Adjudicators by: (i) withholding their identity from Doe until the Hearing started, and (ii) not providing Doe a meaningful opportunity to review the Adjudicators' backgrounds and/or object to Purdue's decision to appoint them as Adjudicators;

**Answer:**     **Defendants admit that Purdue's policies (available at https://www.purdue.edu/policies/a-z_index.html and http://earchives.lib.purdue.edu/cdm/search/collection/PPA/searchterm/*, and portions of which are contained at Second Am. Compl., Ex. 16 pp. 16-32) were applied as written and as in-effect during the relevant time or times. Purdue's policies speak for themselves. To the extent that Plaintiff's allegations in Paragraph 6 or the footnotes thereto purport to state or paraphrase Purdue's policies, such allegations are incomplete and inaccurate and are therefore denied.**

**Defendants deny any and all remaining allegations that may be contained in Paragraph 6 or the footnotes thereto.**

7.      When Purdue Actors engaged in the conduct detailed in items a-h in the preceding paragraph, they knew they were violating judicial decisions regarding Doe's Title IX and/or due process rights detailed in this Complaint.

**Answer:        Denied.**

8.      Moreover, when Purdue Actors engaged in the conduct detailed in items a-h in ¶6, they violated Doe's due process liberty rights detailed in *Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) by: (a) "withholding the evidence on which [Purdue Actors] relied in adjudicating [Doe's] guilt," and (b) conducting a disciplinary hearing that was a "sham or presence."

**Answer:        Denied.**

9.      Purdue Actors' violations of Purdue Policies, Doe's Title IX, due process, and equal protection rights occurred because of: (a) Purdue Actors' gender biased motivations against male students like Doe ("GBM"); which is demonstrated, in part, in the direct and Indirect Evidence of Gender Bias outlined in this Complaint; and/or (b) Purdue Actors' bias in favor of students

who accuse other students ("Accusing Students") of engaging in sexual misconduct ("BFAS") which is demonstrated, in part, in the direct and indirect evidence of bias outlined in this Complaint.

      **Answer:**      **Denied.**

10.    Evidence of Purdue's GBM and/or BFAS was evidenced in part in oral arguments before the United States Court of Appeals for the Seventh Circuit in *Doe v. Purdue Univ., et al., Case No. 17-3565*. *See e.g.*, https://academicwonderland.com/2018/09/18/possible-victory-for-accused-student-in-7th-circuit/ (last accessed May 20, 2019) (containing links to oral argument presented in Case No. 17-3565) During said argument, Justice Amy Comey Barrett asked Purdue's attorney William Kealey how Purdue could comply with due process protections if its employees disciplined a male student without allowing him to cross examination his female accuser in a "credibility contest" about who was telling the truth about allegations of sexual misconduct. In response, Mr. Kealey replied: "Purdue *has no reason to do anything except* look at the evidence that the [Accusing Student] said was inculpating of [the accused]." *Id.* (emphasis added).

      **Answer:**      **Defendants admit that Paragraph 10 quotes a portion of oral argument in the case of *John Doe v. Purdue University*, No. 17-3565. Except as admitted, denied.**

11.    As a result, Purdue has left Doe no other option but to seek damages and declaratory relief to remedy emotional, mental and economic harm caused by Defendants.

      **Answer:**      **Denied.**

### THE PARTIES, RELEVANT PURDUE EMPLOYEES, VENUE AND JURISDICTION

12.     Doe is a male citizen of South Carolina whose current residence is in Tennessee. He attended Purdue prior to his expulsion.

> **Answer:** **Admitted that John Doe attended Purdue prior to his expulsion. Defendants are without knowledge or information sufficient to form a belief as to any remaining allegations that may be contained in Paragraph 12.**

13.     Purdue is land grant university established by the State of Indiana with its main campus located in West Lafayette, Indiana. Purdue is the beneficiary of state appropriates and is the recipient of state and federal grants and funding. Said funding requires Purdue comply with applicable due process protections and antidiscrimination laws, including, but not limited to, Title IX of the Educational Amendments of 1972 20 USC § 1681 *et seq.*

> **Answer:** **Admitted that "Purdue is a land grant university established by the State of Indiana with its main campus located in West Lafayette, Indiana," and that Purdue is a "recipient of state and federal grants and funding." The remaining allegations contained in Paragraph 13 are denied as a misstatement of law.**

14.     Rollock was Purdue's Vice President at all times relevant to this complaint and acted under the color or law. Rollock's responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process and equal protection protections as well as antidiscrimination laws, including, but not limited to, Title IX of the Educational Amendments of 1972 20 USC § 1681 *et seq.* Pursuant to the Parties' stipulation, Rollock is not a defendant in this action.

> **Answer:** **Admitted that Vice President Rollock directs Purdue's system-wide ethics and compliance programs and that the university's administration has responsibilities for compliance with applicable law. Admitted that Vice President Rollock in her official capacity as Vice President for Ethics and Compliance is a state actor in reference to the events at issue in this matter. Admitted that the parties have stipulated that Vice President Rollock is not named as a defendant in this cause. Except as admitted, denied.**

7

15.      Sermersheim was a Dean at Purdue at all times relevant to this complaint and acted under the color or law. Sermersheim's responsibilities included, but were not limited to, ensuring Purdue with applicable due process and equal protection protections as well as antidiscrimination laws, including, but not limited to, Title IX of the Educational Amendments of 1972 20 USC § 1681 *et seq.* Pursuant to the Parties' stipulation, Sermersheim is named as a defendant in this case in her official capacity as an agent of Purdue as the Purdue employee with the authority, power and ability to perform all of the injunctive relief prayed for as remedies for Counts 1, 3 and 4 in Plaintiff's Complaint. Upon information and belief, Sermersheim is resident and citizen of Indiana.

> **Answer:**      **Admitted that the university's administration has responsibilities for compliance with applicable law. Admitted that Dean Sermersheim in her official capacity as Dean of Students is a state actor in reference to the events at issue in this matter; that the parties have stipulated that Dean Sermersheim is named as a defendant in her official capacity in this cause; and that Dean Sermersheim is a resident and citizen of Indiana. Except as admitted, denied.**

16.      Wright was a Senior Associate Director at Purdue at all times relevant to this complaint and acted under the color or law. Wright's responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process and equal protection protections as well as antidiscrimination laws, including, but not limited to, Title IX of the Educational Amendments of 1972 20 USC § 1681 *et seq.* Pursuant to the Parties' stipulation, Wright is not a defendant in this action.

> **Answer:**      **Admitted that the university's administration has responsibilities for compliance with applicable law. Admitted that Director Wright in her official capacity is a state actor in reference to the events at issue in this matter. Admitted that the parties have stipulated that Director Wright is not named as a defendant in this cause. Except as admitted, denied.**

17.     Rooze was an Investigator at Purdue at all times relevant to this complaint and acted under the color or law. Rooze's responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process and equal protection protections as well as antidiscrimination laws, including, but not limited to, Title IX of the Educational Amendments of 1972 20 USC § 1681 *et seq.* Pursuant to the Parties' stipulation, Rooze is not a defendant in this action.

> **Answer:**       **Admitted that the university's administration has responsibilities for compliance with applicable law. Admitted that Mr. Rooze in his official capacity was a state actor in reference to the events at issue in this matter. Admitted that the parties have stipulated that Mr. Rooze is not named as a defendant in this cause. Except as admitted, denied.**

18.     Adjudicators were responsible for imposing erroneous discipline on Doe and acted under the color or law. Adjudicators' responsibilities included, but were not limited to, ensuring Purdue complied with applicable due process and equal protection protections as well as antidiscrimination laws, including, but not limited to, Title IX of the Educational Amendments of 1972 20 USC § 1681 *et seq.* However, pursuant to the Parties' stipulation, Sermersheim is the only Adjudicator defendant in this action.

> **Answer:**       **Admitted that the university's administration has responsibilities for compliance with applicable law. Admitted that the individuals Doe has named as "Adjudicators," in their official capacities only, were state actors in reference to the events at issue in this matter. Admitted that the parties have stipulated that Dean Sermersheim in her official capacity is the only individual named as a defendant in this case. Except as admitted, denied.**

19.     This Court has jurisdiction because: (i) the case arises under the Constitution of the United States, and (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and 42 U.S.C. § 1983 are civil rights claims.

> **Answer:**       **Admitted that this Court has federal question jurisdiction for John Doe's Title IX claim and constitutional injunctive relief claims.**

20.     This Court has personal jurisdiction over Defendants on the grounds that all Defendants are conducting business at Purdue within the State of Indiana.

      **Answer:**      **Admitted.**

21.     Venue rests with this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Doe's claims occurred in West Lafayette, Indiana.

      **Answer:**      **Admitted.**

<u>**FACTUAL ALLEGATIONS**</u>

22.     Doe and Roe became acquainted on the social media app Tinder in late August 2018. Roe showed her friend – Purdue student O.K. – pictures of Doe and Roe remarked Doe was "so hot."

      **Answer:**      **Defendants are without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 22.**

23.     On August 16, 2018, Doe and Roe exchanged Snapchats and Roe told Doe that she and her friends were looking for a party to attend. Doe told Roe she could come to a party he was attending ("Party 1") after the host of Party 1 said it was okay.

      **Answer:**      **Defendants are without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 23.**

24.     Roe arrived at Party 1 with her friend C.G. about 20 minutes later. Roe then sent Doe a Snapchat to let Doe know she arrived. Doe introduced Roe to people at the party and checked back with her occasionally to see if Roe was enjoying herself.

      **Answer:**      **Admitted that John Doe and Jane Roe attended "Party 1." Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 24.**

25.     Roe, G.G., and C.G. then decided to leave Party 1 about 11:30 pm for another party ("Party 2") and asked Doe if he wanted to join them. Doe agreed. At Party 2, Roe and Doe

engaged in consensual dancing and kissing which included Roe unilaterally "grinding" her buttock into Doe's genital area.

> **Answer:** **Admitted that John Doe and Jane Roe attended "Party 2." Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 25.**

26.     After kissing while dancing, Doe asked Roe if she wanted to go somewhere "more private." Roe said she wanted to do so. Doe found an empty overstuffed chair away from the dancing area and Roe straddled Doe's lap and continued to kiss him while Doe engaged in the consensual touching of Roe's vagina.

> **Answer:** **Defendants are without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 26.**

27.     Doe then got down on his knees in front of Roe and the two continued to kiss while Roe was sitting in the chair.

> **Answer:** **Defendants are without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 27.**

28.     During Party 2, Purdue student J.H. observed Roe engaging in the consensual kissing of Doe and subsequently provided Purdue the following observations of Roe and Doe's actions at Party:

> I remember I was dancing/ talking with my guy friend on one of the elevated tables in the corner of the room and looked over and saw [Doe] and [Roe] dancing together and having fun. I vividly remember [Roe] smiling and grinding on [Doe]. Then I remember the two kissing and making out (still on the dance floor) and both of them were giving effort. It was a *very* mutual experience. I then left the party kinda early and did not see [Doe] for the rest of the night. *Exhibit 1* (containing J.H.'s description of Party 2 which Doe provided to Purdue).

> **Answer:** **Admitted that Paragraph 28 accurately quotes a written statement provided by J.H.**

29.     As Party 2 was winding down, Doe, Roe, G.G., and C.G. then decided to return campus. On the walk back, Roe told Doe and G.G. that a few days earlier she attended a party where a

11

black male had forced her to perform oral sex. After hearing these comments, Doe and G.G. told

Roe they were sorry to hear about her assault and offered their condolences.

> **Answer:** **Admitted that John Doe, Jane Roe, and two other individuals left "Party 2" to return to campus. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 29.**

30.     When Doe, Roe, G.G., and C.G. reached Roe and C.G.'s dorm, Roe asked Doe and G.G.

to come up to her dorm room.

> **Answer:** **Admitted that John Doe, Jane Roe, and two other individuals arrived at Roe's dorm, and that Roe and Doe went to Roe's dorm room. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 30.**

31.     G.G., and C.G. then left because C.G. needed to show G.G. where the bathroom was.

When this occurred, Doe and Roe began kissing again. Roe then removed her shirt and bra and

attempted to unbuckle Doe's belt. Since Roe could not unbuckle the belt, Doe did so and

removed his pants and underwear. While he was doing so, Roe removed her clothing and then

began to perform oral sex on Doe. The consensual nature of this oral sex is not in dispute

because Roe told Purdue that she agreed to perform oral sex on Doe. *See e.g.*, *Infra*, ¶111

(discussing same).

> **Answer:** **Admitted that Roe reported that she initially consented to perform oral sex on Doe. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 31.**

32.     G.G. and Roe's roommate P.H. observed Roe performing oral sex on Doe when they

returned to the room and opened the door. Although P.H. and G.G. quickly closed the door, they

both told Purdue they did not observe anything that suggested a non-consensual sexual

interaction between Roe and Doe. *Id.*

> **Answer:** **Admitted that G.G. and P.H. reported seeing Roe performing oral sex on Doe. Defendants are without knowledge or information sufficient**

**to form a belief as to the remaining allegations contained in Paragraph 32.**

33.     G.G. recorded his actions at Roe's dorm room as follows: "[w]e got to their dorms, and I had to use the restroom so [Roe] and [Doe] went to [Roe]'s room and myself and [Roe]'s friend showed me where the restroom was. After I was done, [Roe]'s friend and I went to in front of [Roe]'s room. I opened the door, and I saw [Roe] giving oral sex to [Doe]. [Doe] had all his clothes on while [Roe] did not have her shirt on. *I could see clearly how she was not getting forced to do anything, and she seemed to do all the work*. I closed the door right after I saw it, and I promptly left the dorms." *Exhibit 2* (containing G.G.'s written statement presented to Purdue by Doe) (emphasis added).

> **Answer:        Admitted that Paragraph 33 accurately paraphrases information shared by G.G. at his interview, and that Paragraph 33 accurately quotes portions of a written statement purportedly authored by G.G., as submitted to Purdue by Doe.**

34.     After P.H. and G.G. exited the room, Doe told Roe they should probably keep the door closed and Roe agreed. So, Doe went to the door and locked it to keep other people from walking in them.

> **Answer:        Admitted that Doe locked the door to Roe's dorm room after P.H. and G.G. had opened said door. Except as admitted, denied.**

35.     Doe and Roe then resumed consensual kissing which Doe subsequently learned left hickeys on Roe's neck and chest. Doe and Roe also discussing whether to have sexual intercourse and decided not to engage in intercourse because they did not have a condom.

> **Answer:        Admitted that Doe caused injuries including substantial bruising to Roe's neck and chest. Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 35.**

36.     Instead of engaging in sexual intercourse, Doe manually stimulated Roe's vagina with his fingers with Roe's consent and Roe again performed consensual oral sex on Doe. After

performing oral sex for a few minutes, Roe told Doe she wanted to stop performing oral sex. Doe agreed they should stop engaging in sexual contact and suggested they let Roe's roommate know she could return to the room.

> **Answer:** **Admitted that Doe digitally penetrated Roe and that Roe again performed oral sex on Doe. Denied that this digital penetration or oral sex was done "with Roe's consent" or was otherwise "consensual." Defendants are without knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 36.**

37. Doe and Roe then dressed and Doe left Roe's dorm room without engaging in any further sexual contact. As Doe left Roe's dorm room, he encountered some of Roe's hall mates, entered a bathroom to put on the remainder of his clothes, exited Roe's dorm and returned to his dorm.

> **Answer:** **Defendants are without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 37.**

38. After August 16, 2018, Roe disseminated her false allegations that Doe sexually assaulted her to some of her friends at Purdue (these statements are collectively referred to as "Roe's False Allegations").

> **Answer:** **Admitted that Roe informed certain other individuals that Doe had sexually assaulted her. Except as admitted, denied.**

39. Ultimately, a resident adviser of Purdue's dorm learned of Roe's False Allegations and reported the allegations to Purdue. And, as detailed below, this report culminated in Purdue's unlawful expulsion of Doe which was triggered by Purdue Actors' GBM and/or BFAS.

> **Answer:** **Admitted that Purdue learned that Doe was alleged to have sexually assaulted Roe. Except as admitted, denied.**

40. Purdue Actors' GBM and BFAS against Doe was caused in part by a lawsuit filed in December of 2017 by a female Purdue student against Purdue, Sermersheim, Rollock, and other Purdue employees including Purdue Office of Institutional Equity ("OIE") Investigator Jacob Amberger ("Amberger") ("Dec. 2017 Lawsuit"). *See*, *Jane Doe v. Purdue Univ. et al.*, No. 4:17-

cv-94-JVB-JEM, Document 20 (containing plaintiff's Amended Complaint in No. 4:17-cv-94-JVB-JEM).

> **Answer:** **Denied.**

41.    Upon information and belief, the Dec. 2017 Lawsuit falsely alleged Purdue, Sermersheim, Rollock, Amberger and other Purdue employees violated female students' Title IX rights by manifesting a bias against females who alleged males engaged in sexual misconduct. *See e.g.*, *Id.*, at ¶128 (alleging "Defendant Purdue engaged in a pattern and practice of behavior designed to favor Plaintiff's [male] attacker, thereby discouraging Plaintiff and other female students from seeking prosecution and further investigation of sexual assaults."); *Id.*, ¶55-57 (alleging "[o]n information and belief, Defendant Purdue University has followed these unconstitutional policies, practices, customs, and/or habits with regard not only to Plaintiff, but also with regard to other female students. . . [and that] Defendants Rollock, Sermersheim . . . Amberger . . at all times relevant hereto, policymakers with actual or delegated authority for the purpose of developing, implementing, and/or supervising Defendant Purdue's unconstitutional policies, practices, customs, and/or habits described herein.")

> **Answer:** **Admitted.**

42.    Evidence supporting the information and belief allegations in the preceding paragraph include, but are not limited to, Purdue's motion to dismiss the Dec. 2017 Lawsuit which stated the lawsuit must be dismissed because plaintiff's "anti-female bias" allegations against the defendants lacked merit. *See*, *Jane Doe v. Purdue Univ. et al.*, No. 4:17-cv-94-JVB-JEM, Document 45 (containing Purdue's *Brief In Support of Defendants' Motion To Dismiss Second Amended Complaint*).

> **Answer:** **Admitted.**

15

43.     Upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by pressure associated with press coverage regarding the Dec. 2017 Lawsuit which perpetrated the false allegation that Purdue violated female students' Title IX rights by manifesting a bias against females who allege males engaged in sexual misconduct. Evidence supporting this allegation includes, but is not limited, press reports issued about the Dec. 2017 Lawsuit. *See e.g.*, Purdue Exponent *Purdue sued over handling of alleged 2015 sexual assault*, Dec. 7, 2017 (https://www.purdueexponent.org/campus/article_15db8e4b-de3c-55db-89bc-9bee8b378cb0.html) (last accessed May 22, 2019); Jconline.com, *Lawsuit: Purdue failed to 'adequately respond' to sexual assault*, Dec. 6, 2017) (https://www.jconline.com/story/news/2017/12/06/lawsuit-purdue-failed-adequately-respond-sexual-assault/927556001/) (last accessed May 22, 2019).

        **Answer:        Denied.**

44.     Purdue Actors' GBM and BFAS against Doe was also caused in part by a lawsuit filed against Purdue on September 20, 2018 by a female student ("Sept. 2018 Lawsuit"). *See*, *Jane Doe v. Purdue Univ. et al.*, No. 4:18-cv-72-JVB-JEM, Document 4 (containing plaintiff's Complaint).

        **Answer:        Denied.**

45.     Upon information and belief, the Sept. 2018 Lawsuit falsely alleged Purdue violated the female student/plaintiff's Title IX rights by failing to protect her and other female students from sexual misconduct. *Id.*, at ¶60. Evidence supporting this allegation includes, but is not limited to, Purdue's Answer to the Sept. 2018 Lawsuit which "[d]enied" Purdue failed to "protect" the plaintiff or other "female students" from sexual misconduct by a Purdue faculty member. *See*, *Jane Doe v. Purdue Univ. et al.*, No. 4:18-cv-72-JVB-JEM, Document 28 (containing Purdue's Answer to Plaintiff's First Amended Complaint).

16

**Answer:**        **Admitted.**

46.    Upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by Defendants desire to refute allegations in the Sept. 2018 Lawsuit which alleged Defendants did not protect females from sexual misconduct perpetrated by males. Evidence supporting this allegation includes, but is not limited, to Purdue's Sept. 21, 2018 press release regarding the Sept. 2018 Lawsuit. Purdue's response stated:

> "Purdue has not yet received the complaint announced by the California law firm's press release, but we are well familiar with the underlying matter. Upon receiving notice of the allegations, the university acted swiftly and decisively. In fact, it would be difficult to find a more clear example of Purdue's intolerance for this type of misconduct. Immediately upon learning of the complaint against Mr. Duerfahrd, Purdue placed him on leave, ordered him to have no contact with students, and launched an investigation. Upon conclusion of the investigation, which substantiated the claim, Mr. Duerfahrd resigned under threat of termination. The entire matter was resolved in a matter of months. Fox59 Web, *'I think you want me to rape you': Lawsuit accuses professor of sexual assault, claims Purdue didn't protect student*, posted Sept. 21, 2018 (https://fox59.com/2018/09/21/i-think-you-want-me-to-rape-you-lawsuit-accuses-professor-of-sexual-assault-claims-purdue-didnt-protect-student/) (last accessed May 22, 2019).

**Answer:**        **Admitted that Paragraph 46 accurately quotes a portion of Purdue's statement as published in the referenced article. Except as admitted, denied.**

47.    Upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by pressure associated with press coverage regarding the Sept. 2018 Lawsuit which perpetrated the false allegation that Purdue failed to protect females from sexual misconduct perpetrated by males. Evidence supporting this allegation includes, but is not limited, press reports issued about The Sept. 2018 Lawsuit. *See e.g.*, Wifi.com, *Purdue and former professor being sued for neglecting extensive sexual abuse case*, posted Sept. 21, 2018 (https://www.wlfi.com/content/news/Purdue-and-former-professor-being-sued-for-neglecting-extensive-sexual-abuse-case-494006421.html) (containing quotations such as: (a) "'It's kind of

scary,' said Kat Kirby, a junior at Purdue. 'I honestly never would have thought that it would happen here. I've heard it happen everywhere else but I can't fathom that.'"; (b) "'They had a man in authority over them trying to take advantage of them because he had power of them, which is really disconcerting,' said Purdue junior Neely Plaspohl."; and (c) "'I know things like that take a long time to process but it doesn't change the fact that it should have been acted upon earlier,' said Plaspohl.") (last accessed May 22, 2019); Purdue Exponent, *Purdue, former prof sued in sex assault, battery case*, Sept. 21, 2018 (www.purdueexponent.org/campus/article_c27c6116-bdd8-11e8-b323-cbc9a3ec2972.html) (last accessed May 22, 2019); Indianapolis Star, *Former Purdue professor accused of sexually assaulting student at the school*, Published 2:55 p.m. ET Sept. 21, 2018 (https://www.indystar.com/story/news/2018/09/21/purdue-university-sexual-assault-title-ix/1381124002) (last accessed May 22, 2019).

   **Answer:**  **Denied.**

48. Similarly, Purdue Actors' GBM and BFAS against Doe was caused in part by a lawsuit filed against Purdue in November 2018 by two female students ("Nov. 2018 Lawsuit"). *See*, *Mary Doe et al. v. Purdue Univ. et al.*, No. 4:18-cv-89, Document 1 (containing plaintiffs' Complaint).

   **Answer:**  **Denied.**

49. Upon information and belief, the Nov. 2018 Lawsuit falsely alleged Purdue, Sermersheim, and Rollock violated the female plaintiffs' Title IX and due process rights by unlawfully disciplining them after they accused male students of engaging in sexual misconduct. *Id.* Evidence supporting this allegation includes, but are not limited to, Purdue's failure to admit to anti-female bias alleged in plaintiffs' complaint. *See*, *Mary Doe et al. v. Purdue Univ. et al.*,

No. 4:18-cv-89, Document 12 (containing Purdue's *Brief In Support of Motion To Dismiss Counts V-III And Sever Plaintiff's Remaining Claims*).

> **Answer:** **Admitted as to the first sentence of Paragraph 49. Defendants deny any remaining allegations as unintelligible.**

50.     Upon information and belief, Purdue Actors' GBM and BFAS against Doe was also caused in part by pressure associated with press coverage regarding the Nov. 2018 Lawsuit which perpetrated the false allegation that Purdue unlawfully disciplining females who accused male students of engaging in sexual misconduct. Evidence supporting this allegation includes, but is not limited, press reports issued about the Nov. 2018 Lawsuit. *See e.g.*, Lafayette Journal & Courier, Lawsuit: *Purdue accused of 'chilling' retaliation on women who reported sexual assaults*, Nov. 14, 2018 (https://www.jconline.com/story/news/2018/11/14/purdue-accused-chilling-retaliation-sexual-assault-reports/2003101002/) (last accessed May 22, 2019) (discussing how Mary Doe and Nancy Roe claimed "Purdue is working under a policy 'either written or unwritten' in which 'women who cannot prove their claims to the satisfaction of Purdue decision-makers face discipline up to expulsion.'"); The Indiana Lawyer, *Women students, expelled after reporting assaults, sue Purdue*, Nov. 19, 2019 (https://www.theindianalawyer.com/articles/print/48734-women-students-expelled-after-reporting-assaults-sue-purdue) (last accessed May 22, 2019) (detailing how female plaintiffs alleged "Purdue treated the Plaintiffs as if they were the accused harassers, imposed lesser penalties on the male students who were accused of harassment, and punished the Plaintiffs for making protected Title IX complaints.").

> **Answer:** **Denied.**

51.     Additionally, upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by pressure associated with protests in October of 2018 by Purdue students

that involved protestors "holding signs that said "Believe Women" and "Vote No on Kavanaugh" as well as chants like "We believe Anita Hill! We believe Dr. Ford!" *See e.g.*, Wlfi.com, Oct. 4, 2018, *Many gather to protest Kavanaugh at West Lafayette Library*, (https://www.wlfi.com/content/news/Many-gather-to-protest-Kavanaugh-at-West-Lafayette-Library-495214071.html) (last accessed May 22, 2019) (stating: "Purdue students, community members, even some children were in attendance. Some holding signs that said, 'Believe Women' and 'Vote No on Kavanaugh.' 'We are on a college campus,' said an organizer of the protest, Megha Anwar. 'Research consistently shows one in three females will be assaulted or harassed while on a college campus. This is why we are here.' The protest started at the Class of 1950 lecture hall on campus. Then they marched through town in silence to the West Lafayette Public Library Amphitheater. Once at the library, chants like 'We believe Anita Hill! We believe Dr. Ford!' began.").

       **Answer:**      **Denied.**

52.     Upon information and belief, Purdue Actors' GBM and BFAS against Doe was also caused in part by pressure associated with a comedian's performance at Purdue University's freshman orientation in August of 2018 which students felt demeaned women and prompted "thousands of students [to leave] in protest." *See e.g.*, *Washington Post*, Aug. 21, 2018 *Comedian apologizes for goading a student into touching him on stage at freshman orientation*, (https://www.washingtonpost.com/news/grade-point/wp/2018/08/20/comedian-faces-calls-for-boycott-after-he-goaded-a-college-student-into-touching-him-onstage/?utm_term=.862c091cf6bf) (last accessed May 22, 2019) (discussing how: (1) how during "Purdue University's freshman orientation . . . comedian Andy Gross goaded a student into touching him onstage in front of an audience of more than 5,000 . . . [in so doing] made the audience so uncomfortable that thousands of students left in protest . . . ."; (2) "School officials

20

had denounced Gross . . . [in part be noting] 'portions of the performance were clearly inappropriate and contrary to the university's values of respect and support for all,' [and that Purdue 'will not work with this comedian again and are proud of our students who are standing up and voicing their concerns about the performance.'").

**Answer:**    **Denied.**

53.    Moreover, upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by pressure associated with newspaper reports in November of 2018 of "increase" in the number of "rapes reported at student housing." Purdue Exponent, Nov. 3, 2018 *Overnight sexual assault reported on McCutcheon Drive,* (https://www.purdueexponent.org/campus/public_safety/article_b1f39fe6-df6e-11e8-9f6a-6b8b380455e0.html) (last accessed May 22, 2019) (noting: (1) "The Purdue University Police Department received a report about a sexual assault in the hours between Friday night and Saturday morning"; (2) how the "most recent data available is from 2017, when 15 rapes originating from on-campus student housing were recorded. That number was up from the 13 rapes reported at student housing in 2016 and the 10 in 2015; and (3) a campus alert regarding the sexual assault "included a statement reassuring victims of the perpetrators' culpability. 'Perpetrators are responsible for sexual assaults,' the email reads. 'Perpetrators take advantage of vulnerability and seek opportunities to commit sexual assaults.'").

**Answer:**    **Denied.**

54.    Upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by pressure associated with press coverage in November of 2017 that identified Purdue as having more "reported rapes" than any other Indiana four-year university. *See e.g.*, Journal & Courier, *Purdue leads state's public colleges in reported rapes*, Nov. 2017

(https://www.jconline.com/story/news/2017/11/10/purdue-leads-states-public-colleges-reported-rapes/826128001/) (last accessed May 22, 2017).

> **Answer:**        **Denied.**

55.    Upon information and belief, Purdue Actors' GBM and BFAS against Doe was also caused in part by pressure associated with complaints filed with the United States Department of Education's ("Dept. of Ed.") Office of Civil Rights ("OCR") which alleged Purdue violated the rights of females who alleged males engaged in sexual misconduct.

> **Answer:**        **Denied.**

56.    Evidence supporting the allegations in the preceding paragraph, includes, but is not limited to, Purdue's decision in May of 2016 to pay a $200,000.00 settlement to a female student who filed an OCR complaint that alleged male professors sexually harassed her. *See generally*, nwi.com, *Update: Valpo women settles sex harassment case with Purdue*, May 26, 2016; (www.nwitimes.com/news/local/porter/update-valpo-woman-settles-sex-harassment-case-with-purdue/article_315a790e-4deb-5979-a006-5233225efeb7.html) (last accessed May 22, 2019).

> **Answer:**        **Denied.**

57.    Evidence supporting the allegation in ¶55, includes, but is not limited to, an OCR investigation of Purdue generated by a June 2016 complaint filed by a female student. *Exhibit 3*, (containing Aug. 5, 2016 letter from OCR to Purdue President Mitchell Daniels). OCR's investigation stemmed from the female's allegation that Purdue discriminated against her based on her "sex" by fail[ing] to properly and equitably respond to complaints, reports and/or incidents of sexual violence" by males thereby "creating for students a sexually hostile environment." *Id.*

> **Answer:**        **Admitted that a female student filed a complaint with the Department of Education in June of 2016 and that the second sentence of**

> **Paragraph 57 accurately summarizes said June 2016 complaint. Except as admitted, denied.**

58.     Evidence supporting the allegation in ¶55, includes, but is not limited to, an OCR investigation of Purdue generated by an Oct. 31, 2016 OCR complaint. *Exhibit 4*, (containing Dec. 12, 2016 letter from OCR to Purdue President Mitchell Daniels). Upon information and belief, OCR's investigation stemmed from a female's allegation that Purdue discriminated against her on the basis of her "sex" by failing to properly and equitably respond to complaints, reports and/or incidents" of sexual violence by males thereby "creating for students a sexually hostile environment." *Id.* Information supporting this belief includes the female gender of the OCR complainants detailed in ¶¶ 55-56 and Doe's inability to identify any publicly available information proving a male student filed an OCR complaint against Purdue prior to Purdue's unlawful discipline of Doe.

> **Answer:**      **Admitted that a female student filed a complaint with the Department of Education in October of 2016 and that the second sentence of Paragraph 58 accurately summarizes said October 2016 complaint. Except as admitted, denied.**

59.     Evidence supporting the allegation in ¶55, includes, but is not limited to, OCR's April 16, 2018 decision to address a March 21, 2018 sexual harassment complaint within the context of an ongoing investigation "or prior findings by other agency meet OCR standards." *Exhibit 5*, (containing *ProPublica Report* on Dept. of Ed. Investigations of Purdue). Upon information and belief, OCR's investigation stemmed from a female's allegation that Purdue sanctioned her sexual harassment by a male. *Id.* Information supporting this belief includes the female gender of the OCR complainants detailed in ¶ 55-56 and Doe's inability to identify any publicly available information proving a male student filed an OCR complaint against Purdue prior to Purdue's unlawful discipline of Doe.

> **Answer:**      **Denied.**

60.     Evidence supporting the allegation in ¶55, includes, but is not limited to, an April 11, 2011 "Dear Colleague" letter issued by OCR which instructed how colleges and universities must investigate and resolve complaints of sexual misconduct under Title IX. ("2011 Dear Colleague Letter") (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html) (last accessed May 22, 2019). This letter manifests Indirect Evidence of Gender Bias in part by equating complainants in sexual misconduct proceedings as being females who must receive preferential treatment. For instance, the 2011 Dear Colleague Letter:

> a)     Suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability. . . ." *Id.*, p.19 (emphasis added);
>
> b)     Warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs." In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. *Id.*, p.15.; and
>
> c)     Requires educational institutions "minimize the burden on the complainant." *Id.* p.15-16.

> **Answer:**     **Denied.**

61.     The 2011 Dear Colleague Letter also manifests Indirect Evidence of Gender Bias by making it more difficult for males accused of sexual misconduct to defend themselves. For example, the 2011 Dear Colleague Letter required schools to adopt the lowest burden of proof – "more likely than not" – in cases involving sexual misconduct. Several colleges had been using "clear and convincing" and some, like Stanford, applied the criminal standard – "beyond a reasonable doubt."

> **Answer:**     **Admitted that the 2011 Dear Colleague Letter endorsed a preponderance of the evidence, i.e., "more likely than not," standard in the context of sexual misconduct allegations. Defendants are without knowledge or information sufficient to form a belief as to other schools. Except as admitted and stated, denied.**

24

62. Some courts have questioned whether OCR's "preponderance of evidence" standard is too low. *See e.g.*, *Lee v. Univ. of New Mexico*, No.1:17-cv-01230, Doc. 36, p.2-3 (N.M. Sept. 20, 2018) (rejecting motion to dismiss student's due process claim because university prohibited him from cross examining witnesses in "formal or evidentiary hearing" and because the court "conclude[d] that preponderance of the evidence is not the proper standard for disciplinary investigations . . . given the significant consequences for students found responsible for engaging in sexual misconduct); *Doe v. Univ. of Mississippi*, No.3:18-cv-138-DPJ-FKB, Docket 60, p.15-21 (S.D.N.D. Miss., Jan. 16, 2019) (rejecting motion to dismiss procedural due process claims based on plaintiff's allegations that following five due process violations occurred: (1) university's Title IX coordinator excluded exculpatory evidence from her report; (2) university's training materials suggested the credibility of accusers need not be diminished by their false testimony or withholding of facts because this behavior is common among sexual assault victims; (3) plaintiff was denied an unbiased adjudication because one of his adjudicators "had previously mocked the defenses raised by men accused of sexual assault;" (4) university prohibited plaintiff from cross-examining "witnesses whose accounts of the evening led to his discipline; and (5) plaintiff's allegation that university's "preponderance of the evidence standard" was too low.")

> **Answer:** **Paragraph 62 does not contain complete and accurate citations and is therefore denied.**

63. Evidence supporting the allegation in ¶55, includes, but is not limited to, an OCR directive signed by OCR's then Asst. Sec. of Ed. Catherine E. Lhamon ("Sec. Lhamon") titled "Questions and Answers on Title IX and Sexual Violence" ("OCR's 2014 Q&A") (available at http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf) (last accessed May 22, 2019). This OCR directive manifest Indirect Evidence of Gender Bias in part because it

hampered the accused student's ability to defend himself by reducing or eliminating the ability to expose credibility flaws in the allegations made against him. For example, OCR's 2014 Q&A states universities:

a)   "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings. OCR's 2014 Q&A, p.30;

b)   May decide to eliminate all opportunities for "cross-examination." *Id.*, p.31; and

c)   Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event." *Id.*, pp.30, 38.

**Answer:      Denied.**

64.    Upon information and belief, Purdue institutionalized OCR's Indirect Evidence of Gender Bias into Purdue's implementation of Purdue Policies. Evidence supporting this allegation includes, but is not limited, to threats made by Sec. Lhamon when she told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." See, Colleges Are Reminded of Federal Eye on Handling Sexual-Assault Cases, Chronicles of Higher Education, February 11, 2014, (available at http://chronicle.com/article/Colleges-Are-Reminded-of-144703/) (last accessed May 22, 2019).

**Answer:      Denied.**

65.    Evidence supporting the allegation in ¶55, includes, but is not limited to, the fact that OCR's investigations of Purdue put millions of dollars in federal student aid at risk. This is because DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university, such as Purdue, did not do enough to discipline males alleges to have engaged in sexual misconduct with female students.

Sec. Lhamon confirmed this risk of losing federal funds at a national conference at Dartmouth when she said, "I will go to enforcement, and I am prepared to withhold federal funds." See, *How Campus Sexual Assaults Came to Command New Attention*, NPR, August 12, 2014 (located at http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention) (last accessed May 22, 2019).

> **Answer:** **Defendants are without knowledge or information sufficient to form a belief as to the allegations in Paragraph 65 and so deny the same.**

66.    Similarly, Sec. Lhamon told a Senate Committee, "[t]his Administration is committed to using all its tools to ensure that all schools comply with Title IX. . . ." In addition, Sec. Lhamon noted:

> "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments."

> **Answer:** **Defendants state that they are without knowledge or information sufficient to form a belief as to the truth of the foregoing allegation.**

67.    Upon information and belief, OCR's Chicago Office – which prosecutes complaints filed against Indiana universities – continues to advance Sec. Lhamon's GBM and BFAS even after Sec. Lhamon's departure from OCR. Information supporting this believe includes, but is not limited to, the fact that the Director and numerous senior attorneys at OCR's Chicago Office worked under Sec. Lhamon during her entire tenure at OCR. *See e.g.*, (https://www2.ed.gov/about/offices/or/ed-org-directory.pdf (last accessed May 22, 2019) (identifying the following individuals as being employed at OCR's Chicago Office as of March

8, 2018: Adelle Rapport, Algis Tamosiunas, Karen Mines, Judith Levitt, and Jeff Turnbull); (https://www.federalpay.org/employees/office-for-civil-rights/top-100/2017) (last accessed May 22, 2019) (containing links to dates when said OCR employees were hired which predate Sec. Lhamon's tenure at OCR).

> **Answer:**        **Denied.**

68.     Upon information and belief, for Purdue, the withdrawal of federal funding would be catastrophic, in part, because, in academic year 2016-17 Purdue undergraduate students received more      than      25      million      dollars      in      federal      student      loans. (https://nces.ed.gov/collegenavigator/?q=purdue&s=all&id=151102#finaid) (last accessed May 22, 2019).

> **Answer:**        **Defendants are without knowledge or information sufficient to form a belief as to the incomplete hypothetical alleged in Paragraph 68.**

69.     Similarly, evidence supporting the allegation in ¶55 includes, but is not limited to, the fact that at least 19 courts identified OCR pressure on defendant universities as establishing plausible evidence of gender bias sufficient to reject motions to dismiss Title IX claims. *See*, *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) (reversing dismissal of Title IX erroneous result claim in part because "[a]round two years before Doe's disciplinary proceeding, the federal government launched an investigation to determine whether the university's process for responding to allegations of sexual misconduct discriminated against women."); *Miami Univ.*, 882 F.3d 579, 592-94 (6th Cir. 2018) (finding plaintiff established a "pattern of gender-based decision-making in part because plaintiff alleged defendant university faced "external pressure" from the federal government, President Obama's Administration, and/or OCR); *Schaumleffel v. Muskingum University*, Case No. 2:17-cv-463-GCS-KAJ, 2018 WL 1173043, *16 (S.D.OH. Mar. 6, 2018) (rejecting motion to dismiss Title IX claim because plaintiff alleged he was erroneously expelled

in part because DOE pressure caused university to "fear" a loss of "federal funding."); *Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475, 2018 WL 705886, *9 (S.D.W.D.OH. Feb. 5, 2018); (rejecting motion to dismiss in part because of alleged gender bias pressure linked to OCR Title IX investigation since "[t]he Sixth Circuit has recognized that being investigated by the federal government for potential Title IX violations is a relevant allegation suggesting that the university might be induced to discriminate against males in disciplinary hearings for alleged sexual assault"); *Doe v. Ohio State Univ.*, No. 2:16-CV-171, 2017 WL 951464, *15, 17 (S.D.OH. Mar. 10, 2017) (noting Title IX plaintiff alleged indirect/circumstantial evidence of gender bias in part by alleging "pressure from the executive branch of the Federal government . . . [related to] the temporal connection between . . . [DOE's] investigation of OSU and OSU's investigation of" plaintiff); *Doe v. Marymount Univ.*, Case No. 1:17-cv-401-TSE-MSN, 2018 WL 1352158, *10 (E.D.VA. Mar. 14, 2018) (rejecting motion to dismiss in part because plaintiff alleged: "Marymount's sexual assault policy was influenced by [OCR's] Dear Colleague Letter and other political forces and that the University's procedures were designed to convict male students of sexual assault, whether they were guilty or not . . . ."); *Doe v. Syracuse Univ.*, No.17-cv-787, 2018 WL 4440530, *9 (N.D.N.Y. Sept. 16, 2018) (rejecting MTD Title IX claim because a "reasonable inference could be drawn" that university investigators and adjudicators were "motivated to refute [public] criticisms [of Syracuse's handling of sexual abuse allegations] by siding with the accusing female and against the accused male.' . . . In part because of prior OCR investigations of Syracuse) (internal citations omitted); *Neal v. Col. St. Univ.*, No. 16-cv-873- (RM)(CBS), 2017 WL 633045, *14 (D.Col. Feb. 16, 2017) (rejecting motion to dismiss in part because plaintiff alleged his erroneous outcome involved university succumbing to "pressure to avoid DOE investigation and loss of federal funding . . . ."); *Doe v. Washington & Lee Univ.*, No.

6:14-cv-00052, 2015 U.S. Dist. LEXIS 102426, *29 (W.D.Va., Aug. 5, 2015) (refusing to dismiss Title IX claim in part because plaintiff alleged university was "under pressure from the government to convict male students of sexual assault, [therefore] a reasonable fact finder could plausibly determine that Plaintiff was wrongly found responsible for sexual misconduct and that this erroneous finding was motivated by gender bias."); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 747, 751 (S.D.OH. 2014) (rejecting motion to dismiss in part because plaintiff alleged university made him a "scapegoat" in reaction to OCR's investigations of the university)); *Collick v. William Paterson Univ.* No. 16-471(KM)(JBC), 2016 WL 6824374, *12 (D.N.J. Nov. 17, 2016) (refusing to dismiss a Title IX claim in part because plaintiff alleged OCR pressure may have caused university to "believe it was in the spotlight" and therefore erroneously disciplined plaintiff to show it would sanction males accused of sexual misconduct) (affirmed in part, remanded in part on different grounds by *Collick v. William Paterson Univ.*, 699 Fed.Appx. 129 (3rd Cir. 2017)); *Doe v. Lynn Univ. Inc.* 235 F.Supp.3d 1336 (S.D.FL. 2017) (refusing to dismiss Title IX claim where plaintiff alleged his discipline occurred in part because of pressure related to DOE directives interpreted by university as mandating discipline of male students accused of sexually assaulting female students); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d, 748, 768 (D.Md. 2015) (same); *Doe v. Regents of Univ. of California*, No. 2:15-cv-02478-SVW-JEM (C.D.CA June 8, 2017) (rejecting motion to dismiss because plaintiff alleged university faced "growing local and national pressure" to discipline male students generated in part by female students' OCR complaints alleging the university "failed to adequately handle their complaints of sexual assault.") (reversed on other grounds by *Doe v. Regents of Univ. of California*, 2018 WL 1476666 (9th Cir. 2018). *Doe v. George Washington Univ.* No.18-cv-553, 2018 WL 6700596, *7 (D.C. Dec. 20, 2018) (rejecting motion to dismiss Title IX claim in part because plaintiff

established plausible gender bias by alleging multiple OCR investigations against defendant university); *Norris v. Univ. of Colorado, Boulder*, Civil Case No. 1:18-cv-02243-LTB, 2019 WL 764568, *11 (D. Co. Feb. 21, 2019) (rejecting motion to dismiss Title IX claim because plaintiff alleged OCR/federal pressure on defendant university similar to – or less egregious than – that in Doe's Complaint); *Noakes v. Syracuse Univ.*, No. 5:18-cv-43 (TJM/DEP), 2019 WL 936875 *12 (N.D.N.Y. Feb. 26, 2019) (same); *Doe v. Rollins Coll.*, No. 6:18-cv-1069-Orl-37KRS, 2019 WL 208283, *3 (M.D. Fla. Jan. 16, 2019) (same); *Jia v. Univ of Miami*, No.1-17-cv-20018, Docket 160, p.10 (S.D.Fla. Feb. 12, 2019) (same).

> **Answer:**     **Paragraph 69 does not contain complete and accurate citations and is therefore denied.**

70.    Upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by Purdue's practice of "believ[ing]" students who allege they were sexually assaulted. *See e.g.*, https://www.purdue.edu/sexual_assault/howtohelp/support/index.html (last accessed May 22, 2019) (stating that "[w]hen you learn that someone you know has experienced sexual assault, relationship violence or stalking . . . Believe them. Our culture makes it very difficult to talk about sexual assault, and the fear of not being believed is a very real concern for people who have been assaulted. Don't contribute to that fear.").

> **Answer:**     **Denied.**

71.    As detailed below in ¶¶80-81, Purdue prohibited Doe from including other evidence of Purdue Actors' GBM and/or BFAS by refusing to produce Purdue's training materials regarding how to investigate and adjudicate allegations of sexual misconduct. Upon information and belief, Purdue refused to provide these training materials because they evidenced Purdue Actors' GBM and/or BFAS. Evidence supporting this belief includes, but is not limited to numerous articles and court decisions that address how GBM and/or BFAS has violated the rights of students

accused of sexual misconduct. *John v. Univ. of Mississippi*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, \*4-7 (S.D.Miss July 24, 2018) (refusing to dismiss a Title IX claim, in part, because the university's Title IX training materials "might suggest bias" favoring accusing students); *John v. the Univ. of Colorado, Boulder*, No. 1:18-cv-02243-LTB, 2019 WL 764568, \*9. (D. Co. Feb. 21, 2019) (denying motion to dismiss a male plaintiff's Title IX claim because the plaintiff alleged the university's "trauma-informed" practices favored female Accusing Students); *John v. The Trustees of The Univ. of Penn.*, No.16-5088, 2017 WL 4049033 \*10 (E.D. Pa. Sept. 13, 2017) (rejecting motion to dismiss a male plaintiff's contract claim in part because his universities' policies required investigators and adjudicators be trained "to provide a process that is 'free of bias'' and plaintiff alleged the university's training did: "not promote fairness and impartiality' and, instead, 'undermine[d] principles of impartiality, favor[ed] complainants (typically female), and [created] biase[d] proceedings against respondents (typically male)."); *John v. Ohio State Univ.*, 219 F. Supp. 3d 645, 658 (S.D. Ohio 2016) (noting biased sexual misconduct training can overcome the "presumption" that university employees acted with "honesty and integrity" in disciplining a student for alleged sexual misconduct); Emily Yoffe, "The Bad Science Behind Campus Response to Sexual Assault," *The Atlantic*, Sept. 8, 2017 which noted: "[a]ssertions about how trauma physiologically impedes the ability to resist or coherently remember assault have greatly undermined defense against assault allegations. But science offers little support for these claims."), https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ (assessed May 22, 2019); KC Johnson and Stuart Taylor, "The Title IX Training Travesty," *The Weekly Standard*, Nov. 10, 2017,

https://www.weeklystandard.com/kc-johnson-and-stuart-taylor-jr/the-title-ix-training-travesty

(assessed May 22, 2019).

        **Answer:**       **Denied.**

72.    Upon information and belief, Purdue Actors' GBM and BFAS against Doe was also caused in part by pressure associated with Purdue's association with *The Clothesline Project*. *See e.g.*, *Exhibit 6* (identifying *The Clothesline Project* as part of Purdue's 2019 Sexual Assault Awareness Month programing); *Exhibit 7* (identifying *The Clothesline Project* as part of Purdue's 2016 Sexual Assault Awareness Month programing). Evidence supporting this belief includes, but is not limited to direct and/or Indirect Gender Bias Evidence associated with *The Clothesline Project* such as the following statements on the project's website:

    a)    Clothesline Project's events are designed to develop "provocative 'in-your face' educational and healing tool[s]" that "break the silence and bear witness to <u>one issue</u> – <u>*violence against women*</u>;"

    b)    Defines a "[s]urvivor" as "a <u>*woman*</u> who has survived intimate personal violence such as a rape; battering, incest, child sexual abuse." and;

    c)    Defines "[v]ictim" as "a <u>*woman*</u> who has died at the hands of her abuser. *Id.*, *Exhibit 8* (containing information from *The Clothesline Project's* website) (emphasis added).

        **Answer:**       **Denied.**

73.    Similarly, upon information and belief, Purdue Actors' GBM and BFAS against Doe was caused in part by pressure associated with *Take Back the Night* rallies that often occur at Purdue. *See e.g.*, *Exhibit 9* (publicizing Purdue's Feminist Action Coalition's sponsorship of a Take Back The Night Rally on April 19, 2018); *Exhibit 7* (identifying a Take Back The Night Rally as part of Purdue's 2016 Sexual Assault Awareness Month programing). Evidence supporting this belief includes, but is not limited to direct and/or Indirect Gender Bias Evidence associated with prominent feminist Christina Hoff Sommers' determination that "'Take Back The Night'

marches" are regularly "driving home the point" to male college students "that women are from Venus and men are from Hell." *Exhibit 10*, (containing Sommers' essay entitled *Why Men Are Avoiding College*.) In addition, takebackthenight.org's website details the organization's "history" of organizing females to engage in advocacy on behalf of females subjected to sexual assault, domestic violence, and other crimes. *Exhibit 11* (containing pages from takebackthenight.org's website).

      **Answer:**    **Denied.**

74.    In part because of the pressure created by the events detailed above, upon information and belief, Purdue Actors manifest GBM and BFAS by only prosecuting "University Initiated Complaints" on behalf females and not male students who allege they were sexually assaulted by females. Information supporting this belief includes Wright's 2018 statement to a male student – made in the presence of Amberger – that the male student must file a formal "complaint" if he wanted Purdue to investigate his allegations that a female student violated Purdue's Policies engaging in sexual activity after the male stated he wanted her to stop.

      **Answer:**    **Denied.**

75.    Similarly, upon information and belief, females students similarly situated to Doe who have been accused of sexual misconduct have either not been charged with violating Purdue Policies or have been penalized to a lesser degree than Doe. Information supporting this belief includes Wright's 2018 statement to a male student – made in the presence of Amberger – that the male student must file a formal "complaint" if he wanted Purdue to investigate his allegations that a female student violated Purdue's Policies engaging in sexual activity after the male stated he wanted her to stop.

      **Answer:**    **Denied.**

76.     Purdue's legitimate goal of preventing sexual assault is not the issue in, nor is it the basis for, this Complaint. Rather, this Complaint addresses how Purdue Actors' GBM and BFAS caused them to: (a) afford females like Roe preferential treatment regarding Title IX and/or Purdue Policies; (b) severely discipline male students like Doe who are alleged to have engaged in sexual misconduct regardless of their innocence, and (c) equate "victim/complainants" in sexual misconduct proceedings as being females who receive preferential treatment over the males they accuse of sexual misconduct.

> **Answer:**     **Admitted that Purdue has a "legitimate goal of preventing sexual assault[.]" Except as admitted, denied.**

77.     Evidence supporting the allegations in the preceding paragraph includes, but is not limited to, Purdue Actors' decision to deprive Doe of rights articulated in the Dept. of Ed's regulations published on November 16, 2018 ("OCR's 2018 Regulations"). *See*, (https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all) (last accessed May 22, 2019) (containing link to OCR's 2018 Regulations). OCR identified a "Guiding Principles" behind OCR's 2018 Regulations was the need to "achieve fairness and reliable outcomes" by requiring "due process protections" such as:

- A **presumption of innocence** throughout the grievance process, with the burden of proof on the school;
- **Live hearings** in the higher education context . . .
- The clear and convincing evidence or preponderance of the evidence standard, subject to limitations;
- The opportunity to **test the credibility** of parties and witnesses through **cross examination**, subject to "rape shield" protections;
- . . . . an equal opportunity to **review the evidence**; [and]
- Title IX Coordinators, investigators, and decision-makers free from bias or conflicts of interest . . . . *Id.*, (containing link to *U.S. Department of Education Proposed Title IX Regulation Fact Sheet*), (emphasis in original).

> **Answer:**     **Admitted that on November 16, 2018, the Department of Education published proposed Title IX regulations as (mis)identified above.**

> **Defendants state, however, that Paragraph 77 does not accurately summarize or characterize the 2018 proposed Title IX regulations and is therefore denied. Defendants deny any and all remaining allegations that may be contained in Paragraph 77. Defendants expressly deny that anything contained in Paragraph 77 is "evidence supporting the allegations in the preceding paragraph" or that Defendants "deprive[d] Doe" of any "rights[.]"**

78.    Yet, as detailed in this Complaint, neither Purdue's Policies nor Purdue Actors afforded Doe the rights identified in the preceding paragraph. Instead, upon information and belief, Purdue Actors allowed their GBM and BFAS to cause them to unlawfully expel him despite the exculpatory evidence establishing his innocence.

> **Answer:      Denied.**

79.    As detailed above, Purdue Actors refused to give Doe access to documents and audio recordings of Purdue's investigation and prosecution of Roe's false allegation that Doe engaged in sexual misconduct.

> **Answer:      Admitted that Doe was not provided with audio recordings of interviews conducted as part of the investigation into Jane Roe's allegations that Doe engaged in sexual misconduct. Except as admitted, denied.**

80.    On or about February 22, 2019, Doe executed Purdue's *Student Information Release Authorization* form and requested Purdue provide Doe: (a) the documents and audio recordings related to Purdue Actors' investigation and adjudication of Roe's false allegations of sexual misconduct. *See*, *Exhibit 20* (containing Doe's request for documents). Doe's request for these materials also included a public records request for materials that would establish Purdue Actors' GBM and/or BFAS. *Id.* Collectively, Doe requested Purdue provide the following materials:

> (a)    All documents related to the University's inquiry into any interaction(s) between [Doe] and [Roe]. These public records include, but are not limited to: (a) all audio recordings made by University of its interactions with [Roe] or any individual with knowledge of interactions between [Roe] and [Doe]; (b) documents, emails, recordings, and any materials related to the University's decision to investigate any allegation [Roe]

made against [Doe] in the absence of a formal complaint by [Roe]; and (c) any reports, documents, emails, recordings, or materials provided to any person investigating or adjudicating any claims that [Doe] or [Roe] may have violated University policies:

(b)   All training materials related to sexual harassment or sexual misconduct that were provided from 2015 until present to Attorney/Director Wright, Investigator Rooze, and/or any University employee involved in investigating or adjudicating any claims that [Doe] or [Roe] may have violated University policies;

(c)   Audio recordings and documents related to all sexual harassment or sexual misconduct investigations conducted by Attorney/Director Wright, Investigator Rooze, and/or any University employee involved in any inquiry related to interaction(s) between [Doe] and [Roe];

(d)   All communications between the University and the United States Department of Education's Office of Civil Rights regarding any complaint filed against the University between 2015 and present; and

(e)   All documents related to allegations alleged in any of the following lawsuits filed against the University in the United States District Court of the Northern District of Indiana: (a) *Jane Doe v. Purdue Univ. et al.*, Case No. 4:18-cv-72; (b) *Mary Doe et al. v. Purdue University, et al.*, Case No. 4:18-cv-89; and (c) *John Doe v. Purdue Univ., et al.*, Case No. 2:17-cv-33. *Id.*

**Answer:**   **Admitted that Doe executed the referenced Student Information Release Authorization Form. Admitted that Doe submitted an APRA request as described above. Except as admitted, denied.**

81.   Although Doe informed Purdue that he required the materials detailed in the preceding paragraph in order to file a lawsuit against Purdue in May of 2019, Purdue only provided Doe some of the materials detailed in the preceding paragraph after Doe filed his initial complaint in this matter.

**Answer:**   **Admitted that Purdue has provided Doe with certain records that are responsive to the APRA request referenced in Paragraph 80.**

82.   As detailed above, Purdue Actors' GBM and/or BFAS caused Purdue to designate itself as the "Complainant" for a "University-Initiated Investigation" that contained the following allegations:

On the evening of August 16, 2018. [Doe] met up with [Roe] at a party ("Party I") at a house occupied by members of the Purdue Men's Swimming & Diving Tea, of which [Doe] are also a member. After staying at that party for approximately 30 minutes, [Doe] and [Roe] walked with friends to another party ("Party 2"). While at both parties [Doe] and [Roe] were drinking alcohol.

It is alleged, that at Party 2, [Doe] became aggressive and possessive with [Roe], including grabbing her by the waist and pulling her back to [Doe] when she tried to walk away from [Doe]. It is alleged that in an effort to "make out" with [Roe], [Doe] pushed her into a windowsill, causing a gash on her leg. It is further alleged that [Doe] kept trying to pull up [Roe]'s shirt during the party while other people were present and that [Roe] had to keep pulling her shirt back down. Additionally, it is alleged while [Doe] were both in the kitchen of the house and after [Doe] sat her down in a recliner, [Doe] penetrated her vagina with [Doe's] finger(s) without her consent.

It is further alleged that [Doe] and [Doe's] male friend walked [Roe] and her roommate back to their residence hall room at Meredith Hall. When [Roe's] roommate escorted [Doe's] male friend to the bathroom, [Doe] sexually assaulted [Roe] by forcing her to perform oral sex on you, inserting [Doe's] finger(s) into her vagina, inserting [Doe's] finger(s) into her anus, and attempting to insert [Doe's] penis into her vagina, all without her consent.

It is further alleged that during this incident, [Doe] bit [Roe] on her breasts and neck without her consent, causing injury to [Roe]. It is further alleged that [Doe] may have strangled [Roe], causing bruising on her neck and throat. Finally, it is alleged that, at some point during this incident. [Doe] locked the door to the residence hall room so that [Roe's] roommate could not enter and that [Doe] did this without [Roe's] knowledge or consent. *Exhibit 12 (*containing Purdue's Office of Institutional Equity's *Allegations Forming the Basis For The University-Initiated Investigation of [Doe]*).

**Answer:**    **Admitted that Purdue began a University-initiated investigation (as that term is used in Purdue's "Procedures for Resolving Complaints of Discrimination and Harassment," contained at Second Am. Compl. Ex. 16 pp. 21-32) into the allegations against Doe.**

**Admitted that the block quote in Paragraph 82 accurately quotes or otherwise paraphrases the August 28, 2018 notice of allegations contained at Second Am. Compl. Ex. 12.**

**Denied as to the existence or operation of any "GBM" or "BFAS."**

**Denied that Purdue was ever designated a "Complainant." Defendants further state that the "Complainant" was at all times Jane Roe.**

> **Defendants deny any and all remaining allegations that may be contained in Paragraph 82.**

83.     The same day OIE opened its investigation, Sermersheim "summarily suspended" Doe from Purdue pending the outcome of the University-Initiated Investigation. *Exhibit 13 (*containing Sermersheim's letter notifying Doe that he was "summarily suspended" from Purdue).

> **Answer:        Admitted that Doe was summarily suspended from Purdue on August 28, 2018, and that he was informed of this via letter signed by Dean Sermersheim. Except as admitted, denied.**

84.     Doe filed a timely appeal of Sermersheim's summary suspension. *Exhibit 14 (*containing Doe's appeal Sermersheim's summary suspension). But, Sermersheim rejected Doe's appeal. *Exhibit 15 (*containing Sermersheim's rejection of Doe's appeal). Sermersheim also "highly encouraged" Doe to "withdraw from the University" because it was unlikely the University-Initiated Investigation would be completed in time for Doe to successfully complete the semester. *Id.*

> **Answer:        Admitted that Doe appealed his summary suspension. Admitted that Doe's appeal was denied and that he was informed of this via the letter dated September 4, 2018, and referenced as Second Am. Compl. Ex. 15. The September 4, 2018 letter speaks for itself.**

85.     On August 30, 2018, Wright informed Doe that she and Rooze would be the investigators for the "University initiated investigation" and requested Doe schedule an appointment to be interviewed. *Exhibit 16* (containing Wright's Aug. 30, 2018 letter and Purdue Policies). Wright's letter stated the "Investigators assigned serve as neutral fact finders." *Id.*

> **Answer:        Admitted.**

86.     When Doe arrived for his audio-recorded interview with Wright and Rooze he learned his fears about Wright and Rooze's inability to serve as "neutral fact finders" were true. Doe's fears were based on his knowledge of some of the GBM and BFAS that existed at Purdue which are

detailed in ¶¶40-75 above. Doe's fears were realized in part because Wright and Rooze: (a) were largely uninterested in Doe's exculpatory evidence and far more interested in supporting the allegations against Doe in Purdue's University-Initiated Investigation, and (b) provided Doe screen shots of Purdue CCTV footage of Doe and Roe's interactions while denying Doe the ability to review the entire CCTV footage which would have undermined the credibility of the testimony of Roe and her female witnesses.

> **Answer:** **Admitted that Doe attended an audio-recorded interview conducted by Wright and Rooze. Admitted that Doe was shown still images captured from security cameras showing Doe, Roe, and two other individuals. Except as admitted, denied.**

87.    Although Purdue refused to provide Doe a copy of the audio-recording of Wright and Rooze interrogation of Doe, Roe, and the other witnesses interviewed by Wright and Rooze, Doe knows that substantial amounts of exculpatory evidence that he provided to Wright and Rooze was not contained in Wright and Rooze's Preliminary Report. But, Doe cannot currently definitely identify this excluded exculpatory evidence because Purdue rejected Doe's repeated requests for a copy of the Preliminary Report and the audio recordings of Wright and Rooze's interviews. *Supra*, ¶¶80-81 (detailing Purdue's rejection of Doe's request for audio and video recordings (and) other documents related to Purdue's investigation and adjudication of Roe's False Allegations).

> **Answer:** **Admitted that Doe was not provided with audio recordings of interviews conducted as part of the investigation into Jane Roe's allegations that Doe engaged in sexual misconduct. Except as admitted, denied.**

88.    Instead, Purdue only allowed Doe to take handwritten notes while reviewing the Wright and Rooze's Preliminary Report in a secure location. In doing so, Purdue manifest GBM and/or BFAS because the "Complainant" in Doe's disciplinary action was Purdue and its employees had unfettered access to the Preliminary Report and audio recordings of all witness interviews.

> **Answer:** **Admitted that Doe was permitted to review the University Investigators' Preliminary Report and all attachments thereto and that Doe was permitted to take handwritten notes to prepare his response, if any. Except as admitted, denied. Defendants further state that the "Complainant" was at all times Jane Roe.**

89. Despite this manifestation of GBM and/or BFAS, Doe used his handwritten notes regarding Wright and Rooze's Preliminary Report to prepare a response which Doe submitted timely to Purdue on December 11, 2018. *Exhibit 21* (containing Doe's Response to Wright and Rooze's Preliminary Report). Doe's response stated:

> **1. Summary Response.** [Roe's] assertion that she was assaulted at Party 2 and in her dorm room is inconsistent with her admission that she voluntarily kissed [Doe] in her dorm room and then willfully performed oral sex. [G.G.] and [P.M.] both witnessed [Roe] performing oral sex on [Doe] and reported that "she was doing all the work" and that everything appeared fine.
>
> [J.K] witnessed [Roe] and [Doe] "all over each other" at Party 2. He also stated that [Roe] was grinding on [Doe]. [G.G.] also reported that [Roe] was "all over [Doe]". When leaving Party 2, [P.M.] stated that, based on her observations, [Roe] "still liked [Doe]". [Roe] was in the presence of several friends at Party 1, Party 2, and on the walk to Meredith Hall. At no time did she state to anyone that she was uncomfortable. In contrast, [Roe] admitted [Doe] into her dorm room and proceeded to perform oral sex on [Doe].
>
> **2. Response to Facts Alleged in Report.**
> **a.** [I.H.] stated they each had 1 shot. [P.M.]said she had one shot and [Roe] and [I.H.] had 2-3 shots. **Analysis: Slight inconsistency in pre-party alcohol consumption.**
>
> **b.** At party 1 [I.H.] states she and [P.M.] consumed 3 solo cups of beer each and [Roe] consumed one more shot of vodka. [P.M.] states she and [I.H.] consumed 1-2 solo cups of beer each and [Roe] consumed 4-5 shots of vodka at party 1. [Roe] stated her friends drank from the keg and she drank from her party mix. **Analysis: level of stated alcohol consumption is inconsistent.**
>
> **c.** [Doe] reported consuming a total of 5 cans of beer. [L.I.] and [B.B.] reported [Doe] had a few beers at party 1. [Roe] and [L.I.] stated [Doe] was tipsy. [B.B.] stated [Doe] as "drunk, but not very drunk". [G.G.] thought [Doe] was intoxicated. [Roe] also described [Doe] as "not stumbling". **Analysis: Level of alcohol consumption/intoxication is consistent.**
>
> **d.** At party 2 [G.G.] stated [G.G.] and [Doe] were "drunk, but not smashed". [I.H.] stated [Doe] as "extremely intoxicated". [I.H.] and [P.M.]both had a few

41

more shots of vodka at party. **Analysis: Contradicting level of intoxication by witnesses.**

**e.** [I.H.] states [Roe] gave signals telling [I.H.] she didn't want to be with [Doe] anymore yet given the opportunity to leave [Roe] did not, nor did she verbalize any discomfort to [I.H.]. **Analysis: If [Roe] was as uncomfortable as she claims she was given a clear and convenient way to leave [Doe] that would not cause a scene why did she not choose to do so?**

**f.** In the kitchen [Roe] states she was comfortable with the kissing. As things progressed she claims to have tried to push [Doe] away subtly, but did not want to make a scene. [Roe] also claims [P.M.] was present with [G.G.] in the room. **Analysis: Why would [Roe] now feel comfortable kissing [Doe] when previously she had stated she was uncomfortable dancing with him and being around him? Also she claims to be uncomfortable with the situation yet does not verbalize any discomfort with [Doe] nor does she verbalize or obtain the attention of [P.M.]her "best friend" who was apparently visibly present to be in the kitchen (the same room) as [Roe] and [Doe] at the time.**

**g.** [Roe] states she was uncomfortable with [Doe] at party 2 claiming [Doe] was "aggressive" yet chooses to "let it slide". [I.H.] tells [Roe] to wait for her and that a friend would walk them back yet [Roe] leaves with [Doe] anyways. [Roe] checks in with [I.H.]. [I.H.] stated later she had a "bad feeling" about [Doe] based on how aggressive he had been with [Roe] earlier and she did not want to see [Roe] leave with [Doe]. **Analysis: If the actions of [Doe] at party 2 had made [Roe] so uncomfortable and [Doe] had been aggressive as [Roe] claims why did she choose to walk with [Doe] anyways. Also if the actions of [Doe] were aggressive towards [Roe] as [I.H.] describes it why did she choose not to verbalize or express her concerns to [Roe] when [Roe] "checked in with her".**

**h.** On the walk between party 2 and third street suites [G.G.] and [Doe] recall [Roe] talking about a previous party during BGR during which she was forced to perform oral sex on a black male. [Roe] and [P.M.] both deny the conversation ever took place. **Analysis: Contradicting stories.**

**i.** From the walk to Third Street to Meredith Hall [Roe] stated [Doe] was "grabbing again" and that [Doe] tried to kiss her and that she just wanted to go home. No statement from [G.G.] or [P.M.] is made about this incident. [Roe] swipes [G.G.] and [Doe] into the residence hall and her room. **Analysis: [Roe] had supposedly been uncomfortable by [Doe]'s actions during the walk merely moments before arriving at Meredith Hall. Despite her apparent discomfort with [Doe] throughout the evening so far and her discomfort with [Doe] only moments before arriving at Meredith she still swipes [Doe] into the dormitory and even leads him to her room. Also [G.G.] and [P.M.] do not note any "grabbing again" actions. Given the most convenient excuse to separate herself from [Doe] by only using her PUID to let herself in [Roe] still**

chooses to let [Doe] in to the dorm with her despite her apparent discomfort with him and his actions throughout the evening.

**j.** While in Meredith Hall [G.G.] and [P.M.] opened the door to [Roe's] room and saw [Roe] performing oral sex on [Doe]. [G.G.] states that [Roe] was "doing all the work". [P.M.] states she thought everything was fine. [Roe] states she agreed to perform oral sex on [Doe]. **Analysis: Witnesses from both parties confirm that [Roe] was giving [Doe] oral sex. [Roe] even states she agreed to oral sex with [Doe]. Again however I think that its worthy to point out that if there had been so many previous aggressive actions that made [Roe] feel uncomfortable being around why would she not only state she was "okay" with "making out" but also agree to oral sex?**

**k.** The account of events by [Roe] of the events that happened in [Roe's] dorm room differ from the account of events that happened in [Roe's] dorm room by [Doe]. [Roe] in her statement says she on several occasions tried to move away from him while they were in the dorm room. **Analysis: [Roe] states she tried to move away from [Doe] although she does not state that [Doe] grabbed her, pinned her down, or prevented her from leaving in any way at all. She does not approach or more towards the door which is merely only several feet from where [Roe] is. If [Roe] had really been as uncomfortable with the situation as she has expressed why didn't she tell [Doe] to leave or approach the exit herself?**

**l.** [O.K.] recalls [Roe] stating that [Doe] had pushed her back into the corner or something like that. [I.H.] states that [Roe] told her that she had a gash on her leg but that [Roe] did not recall how she got the gash. [Roe] reportedly told her that she may have bumped up against something and she thought it might have happened in her dorm room. According to [P.M.] [Roe] brushed off the gash like it was "no big deal". **Analysis: Conflicting statements regarding the source of the gash by witnesses. Initially when asked about the gash no concern is expressed by [Roe]. When confronted by her friends about the gash her friends recall differing explanations of the gash.**

**m.** Appendix 14 [R.W.] states [Roe] never shared any details about being thrown to the ground or possibly strangled by [Doe]. [P.M.] also mentioned that [Roe] did not mentioned [Doe] putting his hands on her neck. **Analysis: The statements from [R.W.]and [P.M.] support that strangulation or use of force to keep [Roe] from leaving did not occur.**

**n.** In the text messages between [Roe] and P.M.], [Roe] texts [P.M.]and tells her "don't tell Jake the guy's name if he asks". **Analysis: I was "followed" on Instagram by an individual named [J.P.] nearly two weeks prior to August 30th 2018. It can be seen through [J.P.'s] Instagram biography that he is from Indiana, attends the University of Alabama, and [Roe] and [P.M.] are mutual followers of him (meaning they follow him on Instagram and he follows**

**them). While it is only speculation I believe the Jake that [Roe] is referring to is [J.P.] and that he may have a strong connection to [Roe] and/or [P.M.]and maybe even the investigation.**

**o.** Regarding the events described by [B.R.] and [N.S.]. **Analysis: The events described by [B.R.] and [N.S.] are inconsistent and irrelevant. The events they described either happened another night or didn't happen at all.** *Id.* (emphasis in original).

> **Answer:** **Admitted that the block quote in Paragraph 89 accurately quotes or otherwise paraphrases Doe's response to the University Investigators' Preliminary Report. Except as admitted, denied.**

90.     After Doe presented his response to Wright and Rooze's Preliminary Report, Wright and Rooze prepared Complainant's Concealed Report which was provided to Adjudicators tasked with serving on Doe's Panel Hearing. But, Complainant's Concealed Report was never provided to Doe.

> **Answer:** **Admitted that Wright and Rooze incorporated Doe's responses, as referenced in Paragraph 89, into a final University Investigators' Report that was provided to Sermersheim and members of the panel. Admitted that neither Doe nor Roe were provided with a copy of the final University Investigators' Report prior to the panel meeting. Except as admitted, denied.**

91.     On December 18, 2018, Doe received a letter from Sermersheim which stated in pertinent part:

> Please be advised that you will be scheduled to meet with the panel on Friday, December 21, 2018 from 9:00 AM to 9:30 AM in Schleman Hall Room 207.

> As explained previously, you may have a support person present during the Formal Resolution Process. "An advisor or support person may not, however, stand in place of either the complainant or respondent, act as legal counsel for a party or otherwise participate in the Formal Resolution Process."

> At the beginning of the meeting, I will give you a few minutes if there are any remarks you wish to share with us, and then I will open it up to the panel members and myself for questions we have for you.

> We have reviewed the complaint, written responses, and the Investigator's Report. Accordingly, the purpose of the meeting is not to conduct another investigation but simply to be able to hear directly from the parties and get

clarification on any questions we might have after having reviewed the written materials. *Exhibit 17* (containing Sermersheim's December 18, 2018 letter).

> **Answer:** **Admitted that Paragraph 91 accurately quotes from a December 18, 2018 letter from Sermersheim to Doe. Denied that Second Am. Compl., Ex. 17 contains said letter.**

92.    Since the only "parties" identified in Sermersheim's December 18, 2018 letter were Doe and the "Complainant" Purdue, Doe was never informed Roe would be providing testimony at Panel Hearing.

> **Answer:** **Denied.**

93.    Purdue Actors prohibited Doe listening to Roe's testimony to Adjudicators which occurred after Doe's Panel Hearing testimony. Therefore, Doe was prohibited from asking Roe questions that would have proven her allegations against Doe were false.

> **Answer:** **Admitted that neither Doe nor Roe were permitted to attend the panel meeting outside of their respective meeting times. Admitted that neither Doe nor Roe were afforded cross-examination of anyone who appeared before the panel. Except as admitted, denied.**

94.    Doe was also not provided the names of the Adjudicators prior to the Panel Hearing. And even though Adjudicators introduced themselves at the Panel Hearing, Doe did not learn the names of Panel Hearing members Ohland, Pinel, and Stevenson until Purdue provided Doe their names after Doe filed his original Complaint in this case.

> **Answer:** **Admitted that neither Doe nor Roe were provided with the names of the panel members prior to the panel meeting. Admitted that panel members Ohland, Pinel, and Stevenson introduced themselves to Doe at the panel meeting. Except as admitted, denied.**

95.    Upon information and belief, Adjudicators were appointed by Sermersheim pursuant to Purdue Policy §(I)(5) which states:

> Within 15 days of receipt of the University Investigator's report, the Chancellor, Dean of Students or Director will convene a meeting with and seek advice from a three-member panel selected by the Chancellor, Dean of Students or Director from the Advisory Committee on Equity consisting of at least one participant who

is a member of the faculty and one participant who is not a member of the faculty. At least two members of the panel shall be representatives of the campus from which the Formal Complaint originated. Prior to the meeting, members of the panel shall be furnished with a copy of the University Investigator's report and copies of any complaint or response of the parties. At the meeting, the panel will be afforded the opportunity to ask questions of the University Investigator. Upon request, the Complainant and Respondent will be afforded an opportunity to meet with the Chancellor, Dean of Students or Director and the panel to make a brief statement and to answer any questions that they may have. Within 10 days following the meeting with the panel from the Advisory Committee on Equity, the Chancellor, Dean of Students or Director shall make a written determination whether a violation of one or both of the Policies has occurred. In the event the charge of discrimination and/or harassment is not substantiated following the written determination of the Chancellor, Dean of Students or Director, reasonable efforts may be taken to restore the Respondent(s) to their prior status. *Exhibit 16*, p.33.

> **Answer:** **Admitted that the quote appears in Section I.5 of "Procedures for Resolving Complaints of Discrimination and Harassment."**

96. Even though Purdue Policy §(I)(5) stated Doe's "responses" must be provided to Adjudicators, upon information and belief, Adjudicators were not provided Doe's response to Wright and Rooze's Preliminary Report which is contained in ¶89. Evidence supporting this allegation includes, but is not limited to, the fact that Doe does not recall Adjudicators asking Doe questions about the exculpatory evidence detailed in Doe's response to Wright and Rooze's Preliminary Report during Doe's Panel Hearing.

> **Answer:** **Denied.**

97. Upon information and belief, Complainant's Concealed Report – which Wright and Rooze's issued after receiving Doe's response to Wright and Rooze's Preliminary Report in ¶89 – did not incorporate the exculpatory analysis from Doe's response in ¶89. Evidence supporting this allegation includes, but is not limited to, the fact that Doe does not recall Adjudicators asking Doe questions about the exculpatory evidence detailed in Doe's response to Wright and Rooze's Preliminary Report during Doe's Panel Hearing.

> **Answer:** **Denied.**

98.     In engaging in the conduct detailed in ¶¶96-97 and 100-101, Wright and Rooze violated Purdue Policies, and Doe's Title IX, due process and/or equal protection rights, by denying Adjudicators facts necessary for rendering credibility determinations regarding the evidence provided by Wright, Rooze, Doe, Roe, and their witnesses. *See e.g.*, *Doe v. Penn St. Univ.*, No.17-cv-1315, 2017 WL 3581672, *10 (Aug. 18 2017) (granting preliminary injunction in due process claim because the investigator improperly: (a) redacted information from her investigative report that "if considered by the ultimate factfinder—the Title IX decision panel, may have altered their ultimate credibility determinations," and (b) created "a funneling effect whereby information deemed irrelevant by the Investigator, an allegedly neutral party, is thereafter disallowed from submission to the Title IX decision panel—the ultimate, and I believe proper, arbiter of both relevance and the accused's fate."); *Doe v. Univ. of Miss.*, No.3:16-cv-63-DPS-FKB, Docket 75, Order (S.D.N.D. Miss. July 24, 2018), PageId.10-12 of 23 (rejecting university's motion to dismiss plaintiff's Title IX claims in part because university's investigator omitted exculpatory evidence from investigator's report); *Doe v. The Penn. State Univ.* No.4:18-cv-164, Docket 27, Memorandum Opinion (M.D. Pa. Aug. 21, 2018) (rejecting university's motion to dismiss male student's due process claim because: "Under PSU's Investigative Model, all of the testimony offered in this matter . . . was filtered by Mr. Peters through his Investigative Packet. That testimony appears only in paraphrased form, with virtually no actual quotes, with no indication of how Mr. Peters edited the individuals' statements to him).

         **Answer:      Denied.**

99.     Purdue Actors prohibited Doe listening to Wright and/or Rooze's testimony to Adjudicators which occurred after Doe's Panel Hearing testimony. Therefore, Doe was prohibited from asking Wright and/or Rooze questions that would expose their GBM and/or BFAS motivated testimony.

> **Answer:**        **Admitted that neither Doe nor Roe were permitted to attend the panel meeting outside of their respective meeting times. Admitted that neither Doe nor Roe were afforded cross-examination of anyone who appeared before the panel. Except as admitted, denied.**

100.    However, upon information and belief, Wright and/or Rooze's testimony to Adjudicators or their Complainant's Concealed Report involved Wright and/or Rooze's recommendations that Adjudicators: (a) find Doe responsible, and/or (b) find Doe and his male witnesses were less credible than Roe and her female witnesses. Evidence supporting this belief includes, but is not limited to, the fact that Adjudicators' questioning of Doe at the Panel Hearing were primarily focused on issues suggesting: (a) Doe's testimony was not creditable, and (b) Doe corrupted his witnesses by talking to them prior to their being interviewed by Wright and Rooze.

> **Answer:**        **Denied.**

101.    Additional evidence for the allegations in the preceding paragraph includes the following statements by Wright and/or Rooze which were not contained in their Preliminary Report but appeared in Sermersheim's December 21, 2018 letter detailing the evidence Adjudicators relied on in expelling Doe:

> The Investigators found that [Doe] contacted many of [Doe's] teammates who were identified as witnesses before they were interviewed by the Investigators. They reported that [Doe] asked what they remembered from that night, what they would tell the Investigators, and that [Doe] shared [Doe's] version of what had happened with [Roe]. [Doe] conversations with these witnesses has the potential to influence the information that they provided the Investigators. *Exhibit 17*, p.2 (containing Sermersheim's December 21, 2018 letter expelling Doe from Purdue.

> **Answer:**        **Admitted that the block quote in Paragraph 101 accurately quotes portions of the December 21, 2018 determination letter from Sermersheim. Except as admitted, denied.**

102.    Upon information and belief, Adjudicators' questioning of Roe – which Doe was not permitted to hear – manifested Adjudicators' GBM and/or BFSA by not questioning the credibility of Roe or her female witnesses. Evidence supporting this belief includes, but is not

limited to information contained in Adjudicators written conclusions finding Doe "responsible" for violating Purdue Policies which found Roe and her female witnesses more creditable than Doe and his witnesses even though this finding was not supported by the preponderance of the evidence. *See generally*, *Exhibit 17* (containing Sermersheim's December 21, 2018 letter detailing the "responsibility" decision reached by the Adjudicators). *See also*, *Infra*, ¶¶ 108-120 (discussing Adjudicators' erroneous credibility determinations).

> **Answer:** Denied.

103.    In engaging in the conduct detailed above Purdue Actors violated Purdue Policies, and Doe's Title IX, due process and/or equal protection rights, by denying Doe access to information Adjudicators relied on in rendering their decision to expel Doe. *See e.g.*, *Newsome v. Batavia Local Sch. Dist.* 842 F.2d 920, 927 (6th Cir. 1988) (holding that the student-plaintiff was denied due process "when the superintendent disclosed to the school board, during [the board's] closed deliberations, new evidence which had not been presented during the open hearing at which [the student-plaintiff] and his attorney were present.").

> **Answer:** Denied.

104.    Purdue's decision to deny Doe access to information they relied upon in expelling Doe irreparably harmed Doe's ability to defend himself. This instance, Adjudicators' comments, questions, and body language during the Panel Hearing manifest GBM and/or BFAS in part by falsely suggested Doe had a history of sexually dominating females. The most prominent example of this behavior was displayed by Sermersheim who posed numerous questions and comments based on sex-based stereotypes such as whether Doe: (a) had a history of acting aggressively with other women he had sex with; (b) lacked the ability to understand how consent to sexual contact could be withdrawn; and (c) had ever been criminally charged for sexual misconduct.

49

**Answer:**      **Denied.**

105.    Sermersheim's behavior detailed above manifest GBM and/or BFAS which irreparably tainted Sermersheim's ability to fulfill her obligations to provide Doe a fair and impartial investigation and adjudication. This is partly because Sermersheim's GBM and/or BFAS was shaped by: (a) temporally connected student protests and/or campus events that manifest GBM and/or BFAS; and (b) pecuniary benefits Sermersheim and Purdue would likely reap in defending themselves against the lawsuits and OCR complaints filed by female Purdue students that are addressed in this Complaint. *See also*, *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (refusing to dismiss Title IX and due process claims advanced by male student/plaintiff in part because his complaint "plausibl[y]" alleged "Sermersheim and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man. The plausibility of that inference is strengthened by a post that CARE put up on its Facebook page during the same month that John was disciplined: an article from *The Washington Post* titled 'Alcohol isn't the cause of campus sexual assault. Men are.' Construing reasonable inferences in John's favor, this statement, which CARE advertised to the campus community, could be understood to blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault.").

**Answer:**      **Denied.**

106.    In engaging in the conduct above Purdue Actors violated Purdue Policies, and Doe's Title IX, due process and/or equal protection rights. *See e.g.*, *Doe v. Miami Univ.*, 882 F.3rd 579, 601 (6th Cir. 2018) (determining plaintiff advanced a valid procedural due process claim related to university employee named Susan Vaughn ("Vaughn") who was alleged to have made "remarks were designed to reduce [plaintiff's] credibility while bolstering Jane's credibility" by "announc[ing] during the hearing that 'I'll bet you do this [i.e., sexually assault women] all the

time.' This statement implies that Vaughn had determined prior to the hearing that [plaintiff's] was responsible for the misconduct alleged in this incident and had a propensity for engaging in sexual misconduct.")

> **Answer:** **Denied.**

107. Similarly, an Adjudicator that Doe believes to be Pinal told Doe that he knew "young men" tend to discuss their sexual exploits with their male friends and asked questions suggesting Doe engaged in similar discussions which corrupted the testimony of Doe's witnesses.

> **Answer:** **Denied.**

108. Evidence of Adjudicators' GBM and/or BFAS was also manifested by their decision to expel Doe based on credibility determinations outlined in Sermersheim's December 21, 2018 expulsion notice to Doe. For instance, on one hand, Adjudicators found Roe and her witnesses more creditable than Doe and his witnesses because: [Roe's] friends corroborated her account" by repeating what Roe told them "had occurred" between Roe and Doe. *Exhibit 17*, p.2 (containing Sermersheim's December 21, 2018 letter expelling Doe from Purdue).

> **Answer:** **Admitted that Doe was found responsible for violation of Purdue's policies in part due to credibility determinations. Admitted that Paragraph 108 accurately quotes certain portions of the December 21, 2018 determination letter. Defendants state, however, that this quoted language is presented out of context and that the alleged context is inaccurate and incomplete. Defendants deny any characterization of this quoted language that may be contained in Paragraph 108. Defendants deny any and all remaining allegations that may be contained in Paragraph 108, including the existence of any "GBM and/or BFAS" as alleged.**

109. On the other hand, Adjudicators expressed "significant concerns about [Doe's] credibility" and the credibility of his male witnesses because the: Investigators found that you contacted many of your teammates who were identified as witnesses before they were interviewed by the Investigators. They reported that you asked what they remembered from that

night, what they would tell the Investigators, and that you shared your version of what had happened with [Roe]. Your conversations with these witnesses has the potential to influence the information that they provided to the Investigators." *Id.*

> **Answer:**      **Admitted that Doe was found responsible for violation of Purdue's policies in part due to credibility determinations. Admitted that Paragraph 109 accurately quotes certain portions of the December 21, 2018 determination letter. Defendants state, however, that this quoted language is presented out of context and that the alleged context is inaccurate and incomplete. Defendants deny any characterization of this quoted language that may be contained in Paragraph 108. Defendants deny any and all remaining allegations that may be contained in Paragraph 109.**

110.   Adjudicators allegation that Roe and her female witnesses were more creditable than Doe and his male witnesses lacked merit because Roe's female witnesses provided testimony about intoxication levels and the events of August 16th and 17th that: (a) proved incorrect, and/or (b) contradicted Roe's testimony. *See e.g.*, *Supra*, ¶89.

> **Answer:**      **Denied.**

111.   Moreover, Adjudicators and Sermersheim found Roe more creditable even though the preponderance of the evidence disproved Roe's allegation that Doe "forced [Roe] to perform oral sex" on Doe. *See*, *Supra*, ¶82 (containing Roe's initial allegations against Doe). Roe's allegation was disproved because Roe changed her story and admitted she agreed to perform oral sex on Doe after learning: (b) Doe testified the oral sex was consensual; and (b) two witnesses reported observing Roe perform consensual oral sex. *Supra*, ¶89(1) and (2)(j) (discussing same). *See also*, *Exhibit 17*, p.7 (containing Sermersheim's December 21, 2018 letter expelling Doe from Purdue which noted the "preponderance of the evidence" proved Roe "initially consented to performing oral sex, but that she withdrew her consent.")

> **Answer:**      **Denied as to "disproved" and therefore denied.**

112.    Adjudicators and Sermersheim magnified the erroneous credibility finding in the preceding paragraph by falsely alleging one of Roe's female friends was an eyewitness to Roe engaging in non-consensual oral sex. Specifically, Adjudicators and/or Sermersheim alleged Roe "is more credible than" Doe because his male witness [G.G.'s] "description of [Roe] when the door to her room was opened [and G.G. and P.H. saw Roe performing oral sex on Doe] *is at odds with* those of [P.H.] who saw her at that point . . . "). *Exhibit 17*, p.2 (containing Sermersheim's December 21, 2018 letter expelling Doe from Purdue) (emphasis added). This allegation is false, because [P.H.] reported Roe "looked fine" when [P.H.] and [G.G.] accidentally opened the door while Roe was performing oral sex on Doe. *Supra*, ¶89(1) (discussing same).

> **Answer:**    **Paragraph 112 does not accurately quote, paraphrase, or characterize the language contained in the December 21, 2018 letter. Therefore, denied.**

113.    Adjudicators and/or Sermersheim's determination that Roe was more creditable than Doe lacks merit because they determined the "preponderance of the evidence" *disproved* Roe's initial allegation that Doe had "strangled" Roe. Compare, *Supra*, ¶82 (containing Roe's initial allegations against Doe), with *Exhibit 17*, p.6 (containing Sermersheim's December 21, 2018 letter expelling Doe from Purdue) (finding "There is no preponderance of the evidence that you strangled [Roe]."

> **Answer:**    **Denied.**

114.    Adjudicators and/or Sermersheim's credibility determination is also unsubstantiated because the preponderance of the evidence proved Roe falsely alleged Doe "pushed" Roe "into a windowsill" at Party 2 and "caus[ed] a gash on her leg." *Compare*, *Supra*, ¶82 (containing Roe's initial allegations against Doe), with *Supra*, ¶89(1) and (2)(j) (detailing evidence in Preliminary Report that disproved Roe's allegation about Doe inflicting a "gash" on Roe's leg).

**Answer:**     **Denied.**

115.    Adjudicators and/or Sermersheim's written findings issued in support of their decision to expel Doe contain none of the credibility defects detailed in ¶¶108-114 above. Instead, these findings raise erroneous alleged credibility defects in the testimony of Doe and his male witnesses. For instance, Doe was found "responsible" for allegedly "penetrat[ing]" Roe's vagina with his "finger[s] without her consent" at Party 2. *Exhibit 17*, pgs. 1 and 4-5 (containing Sermersheim's December 21, 2018 letter expelling Doe from Purdue). Adjudicators and/or Sermersheim reached this determination based on Roe's testimony that when Doe inserted his fingers into her vagina she "tried to push [Doe] away in a subtle manner that would not cause a scene because there were other people in the kitchen." *Id.*, p.4.

**Answer:**     **Admitted that the December 21, 2018 letter includes a finding that Doe was responsible for nonconsensual digital penetration of Roe's vagina at Party 2. Except as admitted, denied.**

116.    Adjudicators and/or Sermersheim's found Roe's testimony in the preceding paragraph more credible than Doe's testimony because Doe allegedly shared "two different versions of what happened in the kitchen" at Party 2. *Id.*, p.5. But, the allegedly "different versions" pale in comparison to Roe's contradicted testimony detailed in ¶¶108-114 above. For, Sermersheim describes Doe's alleged "two different versions" as follows:

> In both versions, [Doe] admitted that [Doe] digitally penetrated [Roe's] vagina. In neither version did [Doe] admit to leaning over her. In one version, [Doe] stated that [Doe] sat in the recliner while [Roe] straddled [Doe]. [Doe] stated while [Doe] were kissing that [Doe] moved [Doe's] hands to her pelvis and inner thighs. [Doe] stated that [Doe] then moved [Doe's] hand back and forth over her vaginal area over her shorts. [Doe] stated that she began moving her body with [Doe's] hand and moved in a manner that allowed [Doe] to put [Doe's] hand down her shorts and panties. [Doe] then stated that [Doe] inserted [Doe's] finger into her vagina, and she seemed to enjoy it. [Doe] said that [Roe and Doe] were kissing and she was moving her hips. Later in [Doe's] interview, [Doe] stated that at first [Doe] sat in the recliner and [Roe] straddled [Doe] but that was uncomfortable so [Doe] switched positions. In this account, [Doe] stated that [Doe] knelt on the floor in front of [Roe] while she sat in the recliner. [Doe] then described how she

slid forward in the chair. Then [Doe] described how [Doe] reached [Doe's] hand up and over the waistband of her shorts and then downward under her panties and then inserted [Doe's] finger into her vagina. *Id.*

> **Answer:**     **Admitted that Paragraph 116 accurately quotes certain portions of the December 21, 2018 letter. Except as admitted, denied.**

117.    Adjudicators and/or Sermersheim aggravated the erroneous credibility finding in ¶¶115-116 by claiming Roe's version of events was more creditable because while Roe "was sitting in the recliner, you leaned over and essentially *trapped* her in the chair and then digitally penetrated her vagina." *Id.*, (emphasis added). This allegation lacks merit because no mention was made about Doe "trapping" Roe in the chair in the Preliminary Report or during the Adjudicators' questioning of Doe.

> **Answer:**     **Admitted that Paragraph 117 accurately quotes a portion of the December 21, 2018 letter. Except as admitted, denied.**

118.    Adjudicators and/or Sermersheim also found Doe and his male witness [G.G.] lacked credibility by falsely determining they lied when they reported Roe told them how she was allegedly sexually assaulted by a black male a few days before August 28, 2018. *Id.*, p.4. Adjudicators and/or Sermersheim reached this conclusion because: (a) " [Roe] flatly denies that she said anything of the sort. She stated that the parties she attended with [Doe] were the only parties she attended during BGR. She also denied a previous sexual assault.", and (b) Roe's female friend [I.H] "denied that this conversation occurred" and noted that if Roe would have been sexually assaulted by this black male that " [Roe] would have shared that with her." *Id.*

> **Answer:**     **Admitted that sub-paragraphs (a) and (b) of Paragraph 118 accurately quote or otherwise paraphrase certain portions of the December 21, 2018 letter. Except as admitted, denied.**

119.    Adjudicators and/or Sermersheim's credibility assessment of Doe and [G.G.'s] testimony about Roe's allegations of the earlier sexual assault lack merit in part because: (a) there was no evidence suggesting [I.H] was able to hear all of Roe's comments to Doe and [G.G.'s] on their

walk back to Roe's dorm room, and (b) Doe and [G.G.'s] testimony about Roe's allegations of the earlier sexual assault suggested her making pattern and practice of making false allegations of sexual assault.

**Answer:** **Denied.**

120.    In engaging in the conduct detailed above, Adjudicators violated Purdue Policies, and Doe's Title IX, due process and/or equal protection rights, by manifesting bias in favor or Roe and her female witnesses over Doe and his male witnesses. *See .e.g.*, *Doe v. Rollins College*, No. 6:18-cv-1069-Orl-37KRS, 2019 WL 208283, *4 (M.D. Fla. Jan. 16, 2019) (rejecting motion to dismiss Title IX erroneous outcome claim in part because college's "investigative report: (a) "credited the testimony of witnesses who were friends or sorority sisters of Jane Roe while rejecting testimony from friends or fraternity brothers of Plaintiff's—based, in part, on the male witnesses' fraternity associations without making the same leap about the female witnesses' sorority associations," and (b) "excused any inconsistencies in Jane Roe's account concerning whether she verbalized consent but entirely disregarded Plaintiff's assessment of consent on account of Plaintiff's prior sexual history, which Plaintiff contends should not have been considered.").

**Answer:** **Denied.**

121.    Upon information and belief, Sermersheim's GBM and/or BFAS caused her to pressure her fellow Adjudicators to reject Doe's exculpatory evidence and confirm Sermersheim's pre-determined decision to expel Doe. Evidence supporting this belief includes, but is not limited to the fact that within a *few hours* of the Hearing Panel's conclusion, Sermersheim sent Doe a *seven-page* single spaced letter detailing the Panel Hearing's rationale for expelling Doe. *Exhibit 17*, (containing Sermersheim's December 21, 2018 letter expelling Doe from Purdue).

> **Answer:** **Admitted that the panel meeting occurred from 9:00 AM until 12:00 PM on December 21, 2018, and that the December 21, 2018 letter containing Dean Sermersheim's findings was issued later that day. Except as admitted, denied.**

122.    In engaging in the conduct detailed above, Sermersheim violated Purdue Policies, and Doe's Title IX, due process and/or equal protection rights, by pressuring Panel Hearing members to expel Doe based on GBM and/or BFAS. *See .e.g.*, *Doe v. Miami Univ.*, 882 F.3rd 579, 602 (noting a due process violation could occur "individual decision-makers were instructed by a superior to alter their disciplinary decisions based on the identity of the student" or that "pressure placed on a university caused employees to feel that they must reach certain outcomes in the institution's adjudicative process in order to protect their own career prospects.")

> **Answer:** **Denied.**

123.    Moreover, the Adjudicators should have recused themselves because they knew their GBM and/or BFAS caused them to be biased against Doe. *See e.g.*, *Doe v. Miami Univ.*, 882 F.3rd 579, 604 (noting plaintiff's "procedural-due-process right to an impartial adjudicator and access to the evidence used against him was clearly established . . . [because] a reasonable person in [university/employee/defendant's] position should have known that she was partial and that she could not, therefore, sit on John's Administrative Hearing Panel.").

> **Answer:** **Denied.**

124.    On December 31, 2018, Doe filed a timely appeal of his expulsion with Rollock. *Exhibit 18* (containing Doe's appeal). Rollock reversed Sermersheim's "determination that a preponderance of the evidence presented in this matter substantiates a finding that your conduct toward [Roe] in the kitchen during 'Party 2'" violated Purdue's Policies. *Exhibit 19* (containing Rollock's January 3, 2019 decision). But, Rollock affirmed the remainder of the Adjudicators' erroneous findings and the expulsion of Doe. *Id.*

> **Answer:**    **Admitted that Doe appealed the findings contained in the December 21, 2018 letter. Admitted that Paragraph 124 accurately quotes or otherwise paraphrases the January 3, 2019 letter from Vice President Rollock containing the results of Doe's appeal. Defendants deny any and all remaining allegations that may be contained in Paragraph 124.**

125.    Rollock's decision in the preceding paragraph altered Doe's legal status at Purdue by formally finding Doe guilty of a sexual offense which deprived Doe of occupational liberty.

> **Answer:**    **Denied.**

126.    Upon information and belief, the GBM and BFAS detailed in this Complaint caused Rollock to affirm the Adjudicators' erroneous findings and expulsion of Doe without conducting a reasonable independent investigation of the facts surrounding Purdue's mishandling of Roe's false allegations against Doe. Evidence supporting these allegations includes, but is not limited to, the fact that Rollock rejected Doe's appeal three days after Doe and these three days fell on the New Year holiday observed by Purdue.

> **Answer:**    **Admitted that Doe's appeal was submitted on December 31, 2018; that Vice President Rollock's decision regarding Doe's appeal was issued on January 3, 2019; and that the New Years holiday fell in the interim period. Except as admitted, denied.**

127.    As a result of Purdue Actors' unlawful actions detailed above, Doe's official Purdue transcript will permanently include the following: "STUDENT EXPELLED EFFECTIVE DECEMBER 31 2018 DUE TO VIOLATIONS OF UNIVERSITY REGULATIONS."

> **Answer:**    **Denied.**

128.    Although Purdue Policies and Purdue Actors may allege a duty to evaluate allegations of sexual misconduct in a gender-neutral fashion, the evidence detailed above proves this acknowledgement is a pretext to hide Purdue Actors' underlying GBM and/or BFAS. As a result, Doe advances the Courts 1-4 below.

> **Answer:**    **Denied.**

**COUNT 1**
**(42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)**
**(Against Sermersheim In Her Official Capacities Only For Injunctive Relief)**

129. Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

> **Answer:** **Defendants incorporate by reference their above-stated answers.**

130. Before enrolling in Purdue, Doe relied on Purdue's promise – as a public university – to honor Doe's due process rights under the United States' Constitution and in doing so Doe also knew he needed to comply with his constitutional obligations to Purdue.

> **Answer:** **Defendants are without knowledge or information sufficient to form a belief as to the allegations of Doe's reliance and state of mind. Except as stated, denied.**

131. Before enrolling in Purdue, Doe reviewed and relied on Purdue's promises in Purdue's Policies and in doing so Doe knew he needed to comply with his obligations detailed in Purdue's Policies.

> **Answer:** **Defendants are without knowledge or information sufficient to form a belief as to the allegations of Doe's reliance and state of mind. Except as stated, denied.**

132. As detailed in part above, Adjudicators and Rollock were involved in decisions about initiating the University Initiated Complaint; investigating said complaint; prosecuting said complaint; adjudicating said complaint; and/or the ratification of the unlawful actions involved in the investigation, prosecution, and/or adjudication of said complaint.

> **Answer:** **Due to lack of foundation as to "involved in decisions" Defendants are without knowledge or information sufficient to form a belief as to the foregoing allegations about initiating, investigating, prosecuting and adjudicating. Denied as to "ratification of the unlawful actions."**

59

133.     The Fourteenth Amendment to the United States Constitution provides that no state shall

"deprive any person of life, liberty, or property, without due process of law."

> **Answer:**        **Admitted that the portion of the Fourteenth Amendment to the United States Constitution referenced above is accurately quoted.**

134.     In this case, Purdue Actors are state actors subject to the Fourteenth Amendment.

> **Answer:**        **Admitted that the individuals Doe has named as "Purdue Actors," in their official capacities only, are state actors in reference to the events at issue in this matter.**

135.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in the action at law, suit in equity, or other proper proceeding for redress. . . .

> **Answer:**        **Admitted.**

136.     Doe has a protected liberty interest in his good name, reputation, honor, and integrity, of

which he cannot be deprived without due process.

> **Answer:**        **Denied.**

137.     Doe has a protected liberty interest in pursuing his education, as well as in future

educational and employment opportunities and occupational liberty, of which he cannot be

deprived without due process.

> **Answer:**        **Denied.**

138.     Doe's constitutionally protected liberty interest in his continued enrollment at Purdue and

his right to complete his undergraduate degree at Purdue was violated by Purdue Actors' actions

detailed in this Complaint.

> **Answer:**        **Denied.**

139.    Doe had a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the Purdue campus.

      **Answer:**    **Denied.**

140.    Doe's constitutionally protected liberty interest in his right to continued enrollment at Purdue also arises from the policies, courses of conduct, practices, and understandings established by Purdue.

      **Answer:**    **Denied.**

141.    Doe's constitutionally protected liberty interest further arises from Purdue's Policies.

      **Answer:**    **Denied.**

142.    It is well established that the Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

      **Answer:**    **Denied.**

143.    The Due Process Clause of the United States Constitution is implicated by higher education disciplinary decisions, including the disciplinary decisions under Purdue's Policies.

      **Answer:**    **Denied.**

144.    A person who has been admitted to a public university has a protected liberty interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

      **Answer:**    **Denied.**

145.    As a result, if Doe as a Purdue student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the due process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Purdue used.

      **Answer:**    **Denied.**

146.    Purdue, as a land grant university established by the State of Indiana, and Sermersheim as agent of Purdue, have a duty to provide Purdue's students equal protection and due process of law by and through any and all policies and procedures set forth by Purdue.

        **Answer:**        **Denied.**

147.    Doe obeyed all institutional rules. Yet, Purdue Actors unlawfully expelled Doe, barred him from Purdue's campus and publishing Doe's name on Purdue's *Persona Non Grata* list which appears on Purdue's website. *See*, https://www.purdue.edu/ehps/police/assistance/stats/personanongrata.html (containing Purdue's *Persona Non Grata* list) (last accessed May 22, 2019).

        **Answer:**        **Admitted that Doe was expelled from his enrollment at Purdue and that Doe is excluded from all Purdue property until December 31, 2028, for his violation of Purdue's policies. Admitted that Doe was previously listed on Purdue's *persona non grata* list at the referenced URL. Except as admitted, denied.**

148.    Doe had a constitutionally protected liberty interest in completing his undergraduate education at Purdue at the time he was disciplined by Purdue and in the future.

        **Answer:**        **Denied.**

149.    Doe was entitled to a meaningful opportunity to be heard and process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing.

        **Answer:**        **Admitted that Doe was entitled to notice and an opportunity to be heard on the terms stated in applicable Purdue policies. Except as admitted, denied.**

150.    Doe was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

> **Answer:** **Admitted that Doe was entitled to notice and an opportunity to be heard on the terms stated in applicable Purdue policies. Except as admitted, denied.**

151.   In the course of such investigation and adjudication, Purdue Actors flagrantly violated Doe's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness in numerous aspects, including, without limitation denying Doe any opportunity to confront evidence, to cross-examine Roe, Wright and/or Rooze and to confront any other witnesses.

> **Answer:** **Denied.**

152.   At least 20 courts have determined the need for cross-examination in adjudications of sexual misconduct allegations at public and private schools. *See e.g.*, *John v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018) (holding: if a public university has to choose between competing narratives to resolve a case, the university *must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder*) (emphasis added); *Powell v. Montana State Univ.*, No. 2:17-cv-15 SEH, Docket 134, p.21 (MT Dec. 21, 2018) (citing lack of cross examination as basis for rejecting university's summary judgment motion to dismiss a procedural due process claim because "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process."); *John v. Univ. of Cinn.* No.16-4693, 2017 WL 4228791, *5 (6th Cir. Sept. 25, 2017) (discussing need for cross-examination in Title IX disciplinary proceedings); *John v. Miami Univ.* 882 F.3d 579 (6th Cir. 2018) (same); *Nokes v. Miami Univ.*, No. 1:17-cv-482, 2017 WL 3674910, *10-12 (S.D.OH. Aug. 25, 2017) (same); *John v. Penn St. Univ.*, No.17-cv-1315, 2017 WL 3581672, *7-8 (M.D.Pa. Aug. 18, 2017) (same); *John v. the Univ. of Colorado, Boulder*, Civil Case No. 1:18-cv-02243-LTB, 2019 WL 764568, *15 (D. Co. Feb. 21, 2019) (rejecting motion to dismiss due process claim because "the

lack of a full hearing with cross-examination provides evidence supporting a claim for a violation of [Doe's] due process rights."); *Oliver v. Univ. of Tx. Southwestern Med. Sch.*, NO. 3:18-CV-1549-B, 2019 WL 536376, *13 (N.D. Tx. Feb. 11, 2019) (rejecting motion to dismiss procedural due process claim in part because university did not provide Doe with an opportunity to cross-examination Doe's accuser in a "live hearing."); *John v. The Regents of The Univ. of Cali.*, No. B283229 2nd App. Dist. 6th Div., p.2 (Oct. 9. 2018) (same); *John v. Univ. of Mississippi*, 361 F.Supp.3d 597, 611-13 (S.D. Miss. 2019) (rejecting motion to dismiss procedural due process claims based on university prohibiting Doe from cross-examining "witnesses whose accounts of the evening led to his discipline."); *Smock v. Bd. of Regents of the Univ. of Mich.* 353 F.Supp.3d 651, 657-58 (E.D. Mich. 2018) (rejecting motion to dismiss procedural due process claims based on university prohibiting Doe from cross-examining witnesses in disciplinary proceeding involving allegations of sexual misconduct); *John v. The Penn. State Univ.* No. 4:18-cv-164, Docket 27, PageId.15-18 of 19, Memorandum Opinion (M.D. Pa. Aug. 21, 2018) (rejecting university's motion to dismiss male student's due process claim is based on concerns about lack of meaningful cross-examination); *John v. Univ. of Southern Mississippi*, No.2:18-cv-153, Docket 35, p.5-7 (S.D.E.D. Miss., Sept. 26, 2018) (enjoining ongoing sexual misconduct disciplinary proceeding because university violated Doe's due process rights by denying him the right to cross-examination); *Jane Roe v. Javaune Adams-Gaton*, Case No. 17-cv-945-EAS-CMV, Docket 46 (S.D.E.D. Oh. April 17, 2018) (enjoining university from imposing Title IX disciplinary sanctions against Doe because her procedural due process rights were violated since she was unable to cross-examine her accusers and/or adverse witnesses during her university level disciplinary hearing); *John v. Univ. of Mich.*, No.2:18-cv-11776-AJT-EAS, Docket 30, PageId.743, 739 *Order Granting In Part and Denying In Part*

*Doe's Motion For Temporary Restraining Order And Preliminary Injunction* (E.D.S.D. Mich. July 6, 2018) (enjoining disciplinary proceeding because university violated Doe's due process rights by not providing "the opportunity for a live hearing" where Doe could submit cross-examination questions to adjudicators to be asked of witnesses because "[w]ithout a live proceeding, the risk of an erroneous deprivation of Doe's interest in his reputation, education, and employment is significant."); *Lee v. Univ. of New Mexico*, No.1:17-cv-01230, Doc. 36, p.2-3 (N.M. Sept. 20, 2018) (rejecting motion to dismiss student's due process claim because university prohibited him from cross-examining witnesses in "formal or evidentiary hearing" and because the court "conclude[d] that preponderance of the evidence may not be the proper standard for disciplinary investigations . . . given the significant consequences for students found responsible for engaging in sexual misconduct); *John v. University of Southern California*, 28 Cal.App.5th 26 (2018) (granting male Doe's writ of administrative mandate because private university did not allow cross-examination during Title IX disciplinary proceeding); *John v. Claremont McKenna College*, 236 Cal.Rptr.3d 655, 656 (Cali. 2nd App. Dist. Aug. 8, 2018) (same); *John v. Allee*, 2019 Call. App. LEXIS 8, *55, 56, 60 (Cal. App. 2d Dist. January 4, 2019) ("We also agree with *Baum*'s holding extending the right of cross-examination to the questioning of witnesses other than the complainant where their credibility is critical to the fact-finder's determination."); *John v. Marymount Univ.*, 297 F.Supp.3d 573, 584 (E.D.VA. Mar. 14, 2018) (rejecting motion to dismiss Title IX claim at private university in part because private university denied Doe right to cross-examine his accuser in Title IX proceeding).

> **Answer:**     **Paragraph 152 does not contain complete and accurate statements of the opinions cited and is therefore denied.**

153.    Since there were no eyewitnesses who observed all of Roe and Doe's physical interactions on August 16, 2018, and no conclusive documentary or physical evidence, Roe's

allegations against Doe came down entirely to a credibility assessment – a choice between believing Roe or Doe.

**Answer:**     **Denied.**

154.   Accordingly, by declaring Doe guilty of sexual assault without ever affording him any opportunity to cross-examine Roe, Wright, Rooze, and/or Roe's witnesses, Purdue Actors violated Doe's clearly established constitutional rights.

**Answer:**     **Denied.**

155.   By engaging in the conduct detailed in this Complaint, Purdue Actors deprived Doe of his liberty interests without affording him basic due process, including, but not limited to: (i) his right to a fair adjudication, free of bias; (ii) his right to be innocent until shown to be responsible; (iii) his right to be heard by an impartial factfinder; (iv) his right to question Roe, Wright, Rooze, and/or Roe's witnesses; and (v) his right to present evidence and witnesses in support of his defense.

**Answer:**     **Denied.**

156.   Purdue Actors, as well as other agents, representatives, and employees of Purdue, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Doe's constitutional rights.

**Answer:**     **Denied.**

157.   Purdue Actors agreed to, approved, and ratified this unconstitutional conduct as described above.

**Answer:**     **Denied.**

158.   As a result of these due process violations, Doe continues to suffer ongoing harm, including damage to his reputation, loss of employment and educational opportunities, and other economic and non-economic damages.

> **Answer:**      **Denied.**

159.   In particular, the discipline imposed by Purdue has permanently damaged Doe's due process liberty interest in the career prospects in his chosen profession, denied him the benefits of education at his chosen school and damaged Doe's reputation. This is partly because Doe is currently seeking to become an attorney and/or work in the field of finance.

> **Answer:**      **Denied.**

160.   Doe's chosen field of employment triggers his legal obligation to disclose – often under penalty of perjury – Purdue's discipline of Doe to: (a) law schools; (b) graduate schools to which Doe might seek an MBA; and/or (c) state and/or federal entities that issue licenses to practice law and/or work in financial services professions. *See generally*, *Exhibit 22*, ¶10 (containing affidavit of Attorney Cynthia Purcell Garret discussing same).

> **Answer:**      **Defendants state that they are without knowledge or information sufficient to form a belief as to the allegations that may be contained in Paragraph 160 and so deny the same.**

161.   It would be virtually impossible for Doe to obtain the educational and/or licensing credentials to practice law or work in the financial services profession without encountering a legal obligation to disclose Purdue's discipline to law schools, graduate schools, and/or licensing boards. This is because applications for most law schools, graduate schools, and licensing boards contain a legal obligation to disclose disciplinary actions such as Purdue's discipline of Doe. *Id.*, ¶11.

> **Answer:**      **Defendants state that they are without knowledge or information sufficient to form a belief as to the allegations that may be contained in Paragraph 161 and so deny the same.**

162.    After Doe complied with his legal obligation to disclose Purdue's discipline to the law schools, graduate schools, and/or licensing boards, Doe would almost certainly be required to sign a release authorizing Purdue to provide the law schools, graduate schools, and/or licensing boards with documents related to Purdue's discipline of Doe. *Id.* ¶12.

> **Answer:**        **Defendants state that they are without knowledge or information sufficient to form a belief as to the allegations that may be contained in Paragraph 162 and so deny the same.**

163.    If Doe signed the release discussed in the preceding paragraph, it would be virtually impossible for Doe to enroll in a law school or graduate school comparable to Purdue. This is because American institutions of higher education with reputations for excellence routinely reject applications of students who disclose sexual misconduct disciplinary findings in applications for admissions. *Id.*, ¶13. *See also*, *Id.*, ¶6 (discussing *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018) (noting "[t]ime and again, this circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct . . . Being labeled a sex offender by a university has both an immediate and lasting impact on a student's life . . . [such as] difficulty obtaining educational and employment opportunities down the road, especially if he is expelled."); *Flaim v. Med Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005) (discussing how disciplinary violation will "interfere with later opportunities for higher education and employment" is so clear as to almost be a truism."); *Marshall v. Indiana Univ.* 170 F.Supp.3d 1201, 2016 (S.D. Ind. Mar. 15, 2015) (discussing the implication of disclosing a sexual misconduct disciplinary finding as being the "inability to reenroll at another university . . . [because any] subsequent university to which a student may apply always knows of the reasons for his prior dismissal. If he leaves without having earned his degree, the student must make an affirmative showing to any subsequent university to which he applies that he left the original university in good standing"); *King v. DePauw Univ.*, 14-cv-70, 2014 WL 4197507 *13 (S.D.

Ind. Aug. 22, 2014) ("[t]he Court finds it inevitable that [plaintiff] would be asked to explain [the discipline to] future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw. Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573, 607 (D. Mass. 2016) (noting a sexual misconduct finding "may permanently scar [a student's] life and career," as he or she would be "marked for life as a sexual predator"); *Furey v. Temple Univ.*, 884 F.Supp.2d 223, 247-48 (E.D.Pa.2012) ("[e]xpulsion denies the student the benefits of education at his chosen school. Expulsion also damages the student's academic and professional reputation, even more so when the charges against him are serious enough to constitute criminal behavior. Expulsion is likely to affect the student's ability to enroll at other institutions of higher education and to pursue a career."); *Greenhill v. Bailey*, 519 F.2d 5, 8 (6th Cir. 1975) (acknowledging expulsion of medical student effectively destroyed his chance of practicing medicine); *Schaer v. Brandeis Univ.*, 716 N.E.2d 1055, 1059 (Mass. App. Ct. 1999) (discussing how student record of misconduct significantly harms student's future career).

> **Answer:** Defendants state that they are without knowledge or information sufficient to form a belief as to the allegations that may be contained in Paragraph 163 and so deny the same.

164.    If Doe failed to report Purdue's discipline on applications to law schools, graduate schools, and/or licensing boards – and Doe's failure was subsequently revealed – it is more likely than not that the academic and licensing institutions would impose sanctions which could include, but not be limited to, expulsion from the academic institutions and/or licensed professions. *Id.*, ¶14.

>    **Answer:**      **Defendants state that they are without knowledge or information sufficient to form a belief as to the allegations that may be contained in Paragraph 164 and so deny the same.**

165.    Accordingly, Sermersheim, is liable to Doe in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

>    **Answer:**      **Denied.**

166.    As a direct and proximate result of the above conduct, Doe sustained tremendous damages, including, without limitation, reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held; economic injuries; and other direct and consequential damages. Doe's interests in the results of the disciplinary process are significant.

>    **Answer:**      **Denied.**

167.    Purdue Actors' conduct as described herein was malicious, reckless, and/or callously indifferent to Doe's rights.

>    **Answer:**      **Denied.**

168.    Sermersheim, is liable for the relief sought in Count1 – and Counts 3 and 4 below – because the Supreme Court's *Ex parte Young* decision determined Eleventh Amendment immunity does not apply to Doe's requests for injunctive relief and/or declaratory judgment. *See generally*, *Ex parte Young*, 209 U.S. 123, 150-156 (1908). *See also*, *Green v. Mansour*, 474 U.S. 64, 106 S. Ct. 423, 428, (1985) (determining declaratory relief is within *ex parte Young's* purview when violations of federal law are threatened or ongoing).

>    **Answer:**      **Denied.**

169.    Doe's request for injunctive relief is prospective in nature in that Doe seeks to enjoin: (a) liability which Purdue threatens to inflict on Doe if – at any time in the future – Doe enters Purdue's campus or property; (b) Purdue's prohibition against Doe's future re-enrollment at Purdue; and/or (c) Purdue's irreparable damage to Doe's future educational and/or employment opportunities detailed above.

> **Answer:**   **Denied. Defendants further state that Doe's exclusion from Purdue property is a question of state law and Purdue's discretionary authority to police the safety of its campus. Any such claim is therefore barred by the Eleventh Amendment.**

170.    Based on facts detailed above and below, Doe is entitled to a declaration that Purdue Policies, as applied to Doe, violate the Due Process Clause of the United States Constitution such that Sermersheim must (i) reinstate Doe as a student and provide Doe a new disciplinary proceeding free from the bias and constitutional violations addressed in this Complaint, and/or (ii) expunge Doe's official and unofficial Purdue files of all information related to his interactions with Roe, including but not limited to charges and sanctions served, and prohibiting Purdue from disclosing such information to any third party. *See e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 666-67 (7th Cir. 2019) (remanding case to district court for a determination if the plaintiff had a "liberty interest" based on his demand for an "expungement" based on the following decisions: "*Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records 'serve[s] the purpose of preventing present and future harm'); *Doe v. Cummins*, 662 F.App'x 437, 444 (6th Cir. 2016) (seeking to 'remove the negative notation from appellants' disciplinary records' is 'nothing more than prospective remedial action'); *Shepard v. Irving*, 77 F.App'x 615, 620 (4th Cir. 2003) (an 'F' grade and a plagiarism conviction 'constitute[d] a continuing injury to the plaintiff' and an action to remove them was 'prospective in nature'").

> **Answer:** **Denied.**

171.    However, Doe does not seek to hold Sermersheim liable in her "individual-capacity" because subsequent to Doe filing his complaint the Seventh Circuit noted its June 2019 decision in *Doe v. Purdue Univ.* was its "first case addressing whether university discipline deprives a student of a *liberty* interest . . . [and therefore] the relevant legal rule was not 'clearly established,' and a reasonable university officer would not have known at the time of John's proceeding that her actions violated the Fourteenth Amendment." *Id.*, 665 (7th Cir. 2019).

> **Answer:** **Admitted that Dean Sermersheim is not named in her individual capacity and admitted that she has qualified immunity in her individual capacity.**

### COUNT 2
### (Violation of Title IX of the Education Amendments of 1972)
### (Against Purdue Only)

172.    Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

> **Answer:** **Defendants incorporate by reference their above-stated answers.**

173.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

> **Answer:** **Admitted.**

174.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972.

> **Answer:** **Admitted.**

175.    In academic year 2019-19, Purdue received millions of dollars in federal funds, student loans and grants.

    **Answer:**    **Admitted.**

176.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

    **Answer:**    **Due to lack of foundation for an incomplete hypothetical, Defendants are without knowledge or information sufficient to form a belief as to the contentions in Paragraph 176.**

177.    To plead an erroneous-outcome claim under Title IX, Doe alleges: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of [his] disciplinary proceeding' and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018) (citation omitted).

    **Answer:**    **Denied that Paragraph 177 states a pleading standard in effect in the Seventh Circuit and denied that Doe alleges actionable facts.**

178.    As detailed above, Purdue Actors' finding that Doe was guilty of non-consensual sexual contact with Roe was erroneous and based on facts that more than establish "articulable doubt" on the accuracy of Purdue's expulsion of Doe.

    **Answer:**    **Denied.**

179.    Doe also details above the particularized causal connection between Doe's erroneous discipline and Purdue's GBM.

    **Answer:**    **Denied.**

180.    Similarly, based in part on ¶¶74-75 above, this Complaint details how Doe satisfies the elements of a selective enforcement claim which the Sixth Circuit defines as requiring a plaintiff

"show that a similarly-situated member of the opposite sex was treated more favorably than

[Doe] due to his . . . gender." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

> **Answer:**    **Denied that Paragraph 180 states a pleading standard in effect in the Seventh Circuit and denied that Doe alleges actionable facts.**

COUNT 3
**Violation of the Equal Protection Clause
of the Fourteenth Amendment to the United States Constitution
(Against Sermersheim In Her Official Capacities Only For Injunctive Relief)**

181.   Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth

herein.

> **Answer:**    **Defendants incorporate by reference their above-stated answers.**

182.   The Fourteenth Amendment to the United States Constitution provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

> **Answer:**    **Admitted.**

183.   The allegations of discrimination made in Counts 1 and 2 above and elsewhere in this

Complaint demonstrate that Purdue Actors violated Doe's clearly established right not to be

discriminated against on the basis of sex, and/or status as student accused of sexual misconduct,

in violation of the Fourteenth Amendment and, therefore, 42 U.S.C. § 1983.

> **Answer:**    **Denied.**

184.   Therefore, Doe is entitled to a declaration that Purdue Policies, as applied to Doe, violate

the Fourteenth Amendment such that Sermersheim must (i) reinstate Doe as a student and

provide Doe a new disciplinary proceeding free from the bias and constitutional violations

addressed in this Complaint, and/or (ii) expunge Doe's official and unofficial Purdue files of all

information related to his interactions with Roe, including but not limited to charges and sanctions served, and prohibiting Purdue from disclosing such information to any third party.

**Answer:       Denied.**

Unnumbered "Wherefore" paragraph:       Wherefore, regarding Counts 1-3, Doe demands judgment and relief against Defendants as follows: (a) Purdue's payment of damages to compensate Doe's past and future pecuniary and/or non-pecuniary damages caused by Purdue Defendants' conduct with regard to Count 2; (b) with regard to Counts 1 and 3, Order(s) requiring Sermersheim (i) reinstate Doe as a student and provide Doe a new disciplinary proceeding free from the bias and constitutional violations addressed in this Complaint, and/or (ii) expunge Doe's official and unofficial Purdue files of all information related to his interactions with Roe, including but not limited to charges and sanctions served, and prohibiting Purdue from disclosing such information to any third party; (c) judgment for attorneys' fees, and/or punitive damages pursuant to any applicable statute; (d) judgment for all other reasonable and customary costs and expenses that were incurred in pursuit of this action; (e) pre-judgment interest and post judgment interest as may be permitted by law and statute; and/or (f) such other and further relief as this court may deem just, proper, equitable, and appropriate.

**Answer:       Denied. Defendants expressly deny that Doe should take anything by way of his Second Amended Complaint.**

### COUNT 4 – DECLARATORY JUDGMENT – Violation of Due Process Provisions of United States (Against Sermersheim In Her Official Capacities Only For Injunctive Relief)

185.    Doe realleges and incorporates all the allegations contained in the preceding paragraphs of the Complaint as though fully rewritten herein.

**Answer:       Defendants incorporate by reference their above-stated answers.**

75

186.   As detailed above, Doe and/or Purdue Actors have a dispute about whether Purdue Policies as applied to Doe violate the Due Process Clause of the United States Constitution which required Doe's disciplinary hearing to be conducted consistent with the customs of a free society.

**Answer:**      **Admitted that Doe and Defendants have a dispute regarding "Purdue Policies as applied." Except as admitted, denied.**

187.   Doe is entitled to a declaration that Purdue Policies, as applied to Doe, violate the Due Process Clause of the United States Constitution such that Sermersheim must (i) reinstate Doe as a student and provide Doe a new disciplinary proceeding free from the bias and constitutional violations addressed in this Complaint, and/or (ii) expunge Doe's official and unofficial Purdue files of all information related to his interactions with Roe, including but not limited to charges and sanctions served, and prohibiting Purdue from disclosing such information to any third party.

**Answer:**      **Denied.**

Unnumbered "Wherefore" paragraph:      Wherefore, regarding Count 4, Doe demands judgment and relief as follows: (a) require Sermersheim (i) reinstate Doe as a student and provide Doe a new disciplinary proceeding free from the bias and conflicts of interests addressed in this Complaint, and/or (ii) expunge Doe's official and unofficial Purdue files of all information related to his interactions with Roe, including but not limited to charges and sanctions served, and prohibiting Purdue from disclosing such information to any third party; (b) judgment for attorneys' fees pursuant to any applicable statute; (c) a permanent injunction prohibiting Purdue from: (i) enforcing discipline that resulted from the unconstitutional hearing, and (ii) subjecting Doe to further disciplinary proceedings tainted by the bias and constitutional violations addressed in this Complaint; and/or (f) such other and further relief as this court may deem just, proper, equitable, and appropriate.

**Answer:**      **Denied. Defendants expressly deny that Doe should take anything by way of his Second Amended Complaint.**

### AFFIRMATIVE DEFENSES

1.  The Eleventh Amendment bar applies and deprives this Court of subject-matter jurisdiction over state-law claims against Purdue and Defendant Sermersheim in her official capacity with Purdue.

2.  Some or all of Plaintiff's claims are barred by the law of the case.

3.  Plaintiff fails to state a claim upon which relief may be granted.

4.  Plaintiff's claims are barred, in whole or in part, because Plaintiff's alleged damages, if any, were caused by Plaintiff's own actions or inactions.

5.  Plaintiff's alleged damages are not causally related to acts or omissions of Purdue or its agents or employees, including Defendant Sermersheim.

6.  Plaintiff's claims are barred, in whole or in part, because Plaintiff's alleged damages, if any, were caused by the acts or omissions of third parties whose acts or omissions were not reasonably foreseeable.

7.  Plaintiff has failed to mitigate damages claimed in this action, and Plaintiff's damages, if any, must be diminished accordingly.

8.  Plaintiff lacks standing for his requested injunctive relief.

9.  Plaintiff's injunctive relief demands are unripe.

10. Plaintiff's injunctive relief claims are moot.

11. Plaintiff's unclean hands render him ineligible for injunctive relief.

12. The due process errors alleged by Plaintiff were harmless.

13. Plaintiff has failed to exhaust his administrative remedies.

14. Plaintiff waived his claim by consenting to Purdue's disciplinary procedures.

       **WHEREFORE**, Defendants pray for the following relief:

A.      Plaintiff takes nothing;

B.      An award of costs and attorneys' fees; and

C.      All other just and proper relief.


**COUNTERCLAIM**

       For its counterclaim, Defendant The Trustees of Purdue University ("Purdue") states as follows:

1.      This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 and Title IX of the Education Amendments of 1972 for the purpose of determining the rights and other legal relations between Defendant/Counterclaimant The Trustees of Purdue University ("Purdue") and Plaintiff/Counterclaim-defendant John Doe.

2.      The present action involves an actual controversy between Purdue and John Doe regarding John Doe's sexual misconduct in violation of Purdue University conduct regulations and the danger that John Doe presents to the Purdue University community.

3.      Purdue University's Policy on Anti-Harassment (III.C.1) defines Harassment and Sexual Violence as offences of the Anti-Harassment Policy.

4.      On the evening of August 16, 2018, at the start of his freshman year, John Doe met up with Jane Roe at a party ("Party 1") at an off-campus residence.

5.      John Doe and Jane Roe left Party 1 and walked with friends to another party ("Party 2").

6.      Jane Roe indicated that she wanted to leave Party 2. John Doe and his male friend walked Jane Roe and her roommate back to Jane Roe's residence hall room.

7.      Jane Roe's roommate escorted John Doe's male friend to the restroom, leaving John Doe and Jane Roe alone in Jane Roe's dorm room.

8.      While in Jane Roe's dorm room, John Doe digitally penetrated Jane Roe's vagina in an aggressive manner such that he caused Jane Roe physical pain. Jane Roe told John Doe to "stop." John Doe then requested that Jane Roe perform oral sex on him.

9.      Jane Roe began to perform oral sex on John Doe. After an indeterminate amount of time, Jane Roe stopped performing oral sex and informed John Doe that she did not want to continue performing oral sex.

10.     After Jane Roe had withdrawn her consent to perform oral sex, and in the absence of Jane Roe's consent to engage in any further sexual activity, John Doe performed the following acts of physical and sexual violence against Jane Roe in Jane Roe's dorm room:

> (i)      John Doe forced Jane Roe to perform non-consensual oral sex on him;
>
> (ii)     John Doe digitally penetrated Jane Roe's vagina and anus without Jane Roe's consent;
>
> (iii)    John Doe attempted to penetrate Jane Roe's vagina with his penis and without Jane Roe's consent. Jane Roe had to "cup" her hand over her vagina to prevent John Doe's attempted penetration; and
>
> (iv)     John Doe bit or otherwise caused physical injuries to Jane Roe's neck and chest. Eyewitness accounts and contemporaneous photographic evidence confirm substantial bruising to Jane Roe's neck and chest caused by John Doe's actions.

11.     At some point during this encounter, and without Jane Roe's knowledge or consent, John Doe locked the door to Jane Roe's dorm room so that Jane Roe's roommate could not enter.

12.     John Doe's actions constitute Sexual Harassment and meet the following definitions of Sexual Violence under Purdue's Anti-Harassment policy:

> (i)      Non-Consensual sexual contact: touching, with any body part or object, another person's intimate parts (e.g., genitalia, groin, breast, buttocks), whether clothed or unclothed; and
>
> (ii)     Non-Consensual sexual intercourse: oral, anal, and/or vaginal penetration, to any degree and with any body part or object.

13.     Purdue has discretionary authority to govern the conduct of persons who are upon Purdue's campuses and other property; to prevent unlawful or objectionable acts that threaten Purdue's facilities or its academic community; and to dismiss, suspend, or otherwise punish any student who violates Purdue's rules or standards of conduct.

14.     Because of John Doe's violation of Purdue's Anti-Harassment Policy by committing acts of physical and sexual violence against Jane Roe as described in the above Paragraphs 10-12, and pursuant to Purdue's discretionary authority as described in the above Paragraph 13, John Doe was expelled from his enrollment at Purdue and was and is excluded from Purdue's property

     WHEREFORE, Purdue hereby prays for the following relief:

A.     Declare that John Doe's above-alleged conduct violated Purdue's conduct regulations;

B.     Declare that Purdue, in the exercise of its discretionary authority as an instrumentality of the State of Indiana to police the safety of its campus, has at all relevant times possessed and continues to possess good and adequate cause to expel John Doe from enrollment at Purdue and to bar John Doe from trespass on Purdue's campuses;

C.     Declare that Purdue, in the exercise of its discretionary authority to protect its educational environment from interference with its educational mission, has at all relevant times possessed and continues to possess good and adequate cause to exclude John Doe from Purdue's educational environment;

D.     Enjoin John Doe from enrolling at Purdue or entering upon Purdue's physical premises without Purdue's discretionary permission.

Dated: July 29, 2020                      Respectfully submitted,

                                          /s/ William P. Kealey
                                          William P. Kealey (Attorney No. 18973-79)
                                          Matthew M. Humble (Attorney No. 35259-53)
                                          STUART & BRANIGIN LLP
                                          300 Main Street, Suite 900
                                          P.O. Box 1010
                                          Lafayette, IN 47902-1010
                                          Telephone: 765-423-1561
                                          Facsimile: 765-742-8175
                                          E-Mail: wpk@stuartlaw.com
                                                  mmh@stuartlaw.com
                                          ***Attorneys for Defendants***

1310843